**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**W. C. McQUAIDE, INC., Respondent.**

### No. 76–1403.

United States Court of Appeals, Third Circuit.

Argued Jan. 11, 1977.
Decided Feb. 24, 1977.

W. Christian Schumann, William R. Stewart, John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

Stephen J. Cabot, Pechner, Dorfman, Wolffe & Rounick, Philadelphia, Pa., for respondent.

Before GIBBONS and GARTH, Circuit Judges, and COHEN, District Judge.*

## OPINION OF THE COURT

GARTH, Circuit Judge.

The National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 151

---

* Mitchell H. Cohen, United States District Court for the District of New Jersey, sitting by designation.

*et seq.,* petitions for enforcement of its order issued against W. C. McQuaide, Inc.[1] We enforce in part and remand for further findings.

## I.

W. C. McQuaide, Inc. (Company) is a family-held corporation which operates a trucking business from its terminal at Johnstown, Pennsylvania. Before the commencement of the strike, the Company employed approximately 300 employees.[2] On April 1, 1974, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America Local 110 (the Union) served on the Company a letter in which it claimed to represent a majority of the drivers and warehousemen. When the Company refused recognition, the Union filed a representation petition with the Board seeking an election. On April 17, 1974, between 120–150 employees struck. The strikers picketed the various entrances to the McQuaide terminal and utilized roving pickets at delivery points. The purpose of the strike was to obtain recognition of the Union, to get a prompt election, and to secure improvements in wages and working conditions.

The strike, which lasted four months, seriously disrupted the Company's business and was marked by considerable damage to Company property. Truck windshields were smashed, air hoses were cut and a warehouse, airplane, and hangar were burned, but the responsibility for these acts could not be attributed to anyone. During the course of the strike, the Company sent letters to striking employees and held meetings encouraging them to return to work.

A week after the strike began, the Company obtained a broad temporary restraining order from the Court of Common Pleas of Cambria County.[3] A modified consent order was entered five days later. On May 1, 1974, the Company petitioned the Court of Common Pleas to have certain named strikers adjudged in contempt of the consent order and a hearing (the Ebensburg hearing) was held on May 6 and 7, 1974. No specific findings of fact were made, but seven strikers were found in contempt. Frank Petrosky, Harry Lavely, Robert Lesnak, Dennis Patterson, Dennis Albert, and Lawrence Gindelsperger were each fined $50. John Geisel was fined $100.[4]

The strike continued and the Company transferred ten employees from other departments to the dock and hired fourteen new employees. On May 17, 1974, nineteen striking dockworkers were notified that they had been permanently replaced. Two days later the Company discharged the seven strikers who were found in contempt at the Ebensburg hearing.

On August 8, 1974, the Company, the Union and their attorneys met at a hearing before the Pennsylvania Unemployment Compensation Board of Review. The Company's attorney, Stephen Cabot, stated that the Company was "ready, willing and able" to take back any employee who wanted to come back. The statement was made privately to Union President Adams as well as in response to the Referee's questions. On the same date, the Union sent a letter to the Company stating that the strikers were "unconditionally ready, willing and able to return to work immediately." The Union

---

1. The Board's order is reported at 220 NLRB 80 (1975).

2. These employees are not represented by any labor organization and previous attempts to organize them have failed.

3. The order was directed at the Union, its officers and twenty-six named strikers. It forbade unlawfully inducing any individual to engage in picketing; forbade mass picketing at specified locations; forbade causing injury to the person of any individual or to McQuaide property in connection with the labor dispute; and forbade the threatening of individuals with personal injury or threatening injury to McQuaide property, or the blocking of the ingress or egress of McQuaide's place of business.

4. Collection of the fines was suspended pending a hearing on the permanent injunction. The hearing never did take place and the fines were never collected.

terminated all pickets except those at the main entrance to the terminal.[5]

Upon receipt of the Union's letter on August 12, 1974, Company President L. McQuaide sent the following letter to a large number of employees:

"Today, for the first time, I have received information which leads me to believe that you may be willing to return to work unconditionally, and to do so at once.

If you desire to return to work unconditionally, please notify me of your:

1. Intention to return to work, and
2. The earliest available date you can return to work.

If you want your previous job which is available, contact me as soon as possible."

On August 15, 1974, L. McQuaide wrote two additional letters to employees. To the dockworkers who had received the replacement letter, he wrote:

As you know on May 17, 1974 I wrote a letter informing you that you were permanently replaced. I would appreciate hearing from you no later than Friday, August 23, 1974, if you have any desire to work for W. C. McQuaide, Inc.

If you are currently available and desire to fill a vacancy should one occur, please notify me of your intention no later than August 23, 1974. If possible, please convey this information to me at my office.

The following letter was sent to the other strikers:

Today, for the first time, I have received information that leads me to believe that you may be willing to return to work unconditionally and to do so at once.

If you desire to return to work unconditionally, please notify me of your:

1. Intention to return to work, and

2. The earliest available date you can return to work.

If I do not hear from you by Friday, August 23, 1974, I will assume that you have no desire to return to work. If possible, please see me at my office to discuss this matter.

During this period of time, Cabot again told Adams that jobs were available to employees who requested them. He complained to Adams that the continuation of a picket line was inconsistent with the Union's letter of August 8. Adams replied that he would do what he could about eliminating the picket line and about having strikers notify McQuaide concerning reinstatement.

On August 29, 1974, L. McQuaide wrote to all strikers who had responded to the Company's August 15 letter. Appointments were scheduled for them to see him in his office. To those who had not responded, L. McQuaide sent letters stating his assumption that they no longer desired to work for the Company and that he would have their personnel records marked accordingly.

Between September 3 and 5, 1974, L. McQuaide interviewed about thirty to forty strikers. In general, he asked them whether they wanted to come back to work and when they would be available. He questioned many of them about strike violence and vandalism.

Between August 18 and November 11, 1974, the Company hired ten new drivers and thirty new dockworkers in addition to the strikers who were reinstated in August.[6]

The Board filed unfair labor practice charges in October 1974, alleging that the Company violated Section 8(a)(1) and (3) of

---

**5.** This picketing continued until the first week of September, 1974.

**6.** No specific findings were made as to which strikers were reinstated in August 1974. Although the Company names twenty-five strikers who were reinstated during the course of the strike and after August 12, 1974, it estimates that approximately ten of them were reinstated in August.

the Act [7] by discharging seven named strikers [8] and by failing to reinstate certain named dockworkers [9] as well as unnamed striking employees, and that the Company violated Section 8(a)(1) of the Act by coercively interrogating applicants for reinstatement. A hearing was held before an Administrative Law Judge who found:

(1) that various Company letters and statements indicated anti-union animus; [10]

(2) that the discharge of Gindelsperger was justified on the basis of serious strike misconduct; [11] but that Geisel, Lavely, Petrosky, Patterson, Albert and Lesnak were unlawfully discharged;

(3) that the Union's offer to return to work was *bona fide* and unconditional;

(4) that neither the Company's statements of August 8 nor the letters of August 12 and 15, 1974 were valid, unconditional offers of reinstatement;

(5) that the Company unlawfully failed to reinstate nineteen named dockworkers and other unnamed strikers after August 12, 1974;

(6) that R. J. Kessler, claimed by the Company to be a supervisor and, therefore, not covered by the provisions of the Act, was an employee within the meaning of the Act;

(7) that the Company unlawfully and coercively interrogated returning strikers Klimek, Edwards, Sawko, Liberfinger, Weyandt, Christener and Wright.

He recommended a broad cease and desist order, the posting of notices and an offer of full reinstatement to the six discharged employees, to the nineteen named strikers and to all employees who concertedly engaged in the work stoppage, with back pay running from five days after August 12, 1974.[12]

The Board's sole disagreement with the Administrative Law Judge concerned the reinstatement of Lesnak, Patterson and Albert. It concluded that each of these strikers had engaged in conduct sufficiently egregious to justify their discharges.[13] In

7. Sec. 8(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7;

\* \* \* \* \* \*

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization

. . . .

8. Dennis Patterson, John Geisel, Harry Lavely, Robert Lesnak, Frank Petrosky, Dennis Albert and Lawrence Gindelsperger.

9. Although the Board's complaint named twenty dockworkers, the list was amended during the hearing and the Administrative Law Judge found that the following nineteen dockworkers received replacement letters: G. S. Marion, J. M. Dikum, R. C. McNulty, R. J. Kessler, J. M. Swinger, G. J. Ferrante, T. N. Spisak, K. C. Huntzinger, G. L. Saylor, K. J. Fuska, J. P. Maderia, D. E. Yeckley, R. E. Josephson, T. Prudhoe, N. V. Barefoot, J. A. Maderia, A. B. Carr, Stephen L. Edwards and Homer Allison.

10. The Administrative Law Judge cited three letters sent early in the strike encouraging employees to return to work.

11. When L. McQuaide was making a delivery in a company truck, Gindelsperger deliberately drove his pickup truck directly in front of McQuaide's vehicle, forcing him to turn sharply, barely avoiding a collision with a car. This incident occurred two or three days before the discharge letter was sent.

Although the Administrative Law Judge expressed the view that some of the other six individuals had committed acts or threats which would justify discharges, their misconduct occurred prior to the Ebensburg hearing. He concluded that the delay in terminating them indicated that the Company did not find their conduct so egregious and that the discharges were really aimed at getting rid of union adherents when the strike continued.

12. It is the Board's established practice to award back pay to unfair labor practice strikers who have not been reinstated in response to an unconditional offer of reinstatement, beginning on the fifth day after the tender of the offer.

13. These findings, which are not now challenged, are supported by substantial evidence. *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Lesnak elbowed a non-striker, threatened to "knock his block off," and put his hands on a truck while threatening to beat the driver's head in. Patterson and Albert pounded on the windshield of a truck while threatening to beat up the non-striking driver.

The Board found that the delay in terminating the strikers was not so unreasonably long as to warrant the inference that the discharges were not, in fact, prompted by strike misconduct.

all other respects, the findings, conclusions and recommendations of the Administrative Law Judge were adopted.

The Company resists the Board's order and argues that most of the findings are either erroneous or not supported by substantial evidence.

## II.

### Reinstatement of Petrosky, Geisel and Lavely

■ At the outset, we reject the Company's contention that the Ebensburg contempt citations justified the discharges of these three strikers. We agree with the Board that, in the absence of specific findings of fact by the Ebensburg court, the contempt rulings are not controlling. In *N.L.R.B. v. Cambria Clay Products, Co.*, 215 F.2d 48 (6th Cir. 1954), the court, faced with a similar situation, stated:

> . . . It is not the fact that there was a violation of the injunction that determines whether they should or should not be reinstated, but the type of conduct they engaged in, and the manner and nature and seriousness of their violation of the order.

*Id.* at 54. *See also N.L.R.B. v. J. H. Rutter-Rex Manufacturing Co., Inc.*, 158 N.L.R.B. 1414, 1419 (1967), *enforced on this ground*, 399 F.2d 356 (5th Cir. 1968); *rev'd on other grounds*, 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969).

■ A significant portion of the record concerns evidence of alleged strike misconduct including the incidents which were the focus of the Ebensburg hearing. Although some of the testimony is in conflict, we will not disturb the Administrative Law Judge's credibility determinations.[14]

The incident attributed to Petrosky occurred on April 30, 1974, when he and two other strikers walked over to where truck-driver Charney and his helper Holderbaum were delivering a ladder to a customer. Petrosky asked Holderbaum, "What the hell are you doing in this god damned truck, I thought you was coming out with us?" When Holderbaum said he thought the strike was over, Petrosky replied, "What do you think we're out here for, our god damned health? You're nothing but a god damned rotten scab."[15]

With respect to Geisel, non-striker Rice testified that shortly after the strike began, strikers Albert and Patterson approached his truck and hammered on the windshield. Geisel "was in the background" screaming "scab, things of this nature." In addition, Rice stated that early in the strike he was riding in a truck when a rock was thrown through the windshield. A few days later he encountered some strikers who asked if he had been hurt. When he said he "wasn't hurt too bad," Geisel remarked, "Maybe next time you won't be so lucky."

Three incidents are attributed to Lavely. Non-striker Kring testified that in late April he was making a delivery when a pickup truck pulled alongside. Lavely, a passenger, shook his fist at Kring and motioned for him to pull over. He ignored the strikers who followed him to his first stop. Kring stated that there was some conversation, "and at the end they shook their fists at me and said we'll get you." Jack Inston testified that, while driving his truck through a picket line in late April, "Harry Lavely and Larry Gindelsperger shook their fists, called me a fucking scab and told me they would knock the goddamn shit out of me if I was driving again." Finally, Thomas Harris testified that in August he was making a delivery at Bethlehem Steel where Lavely, who was working for another company, was also making a delivery. Harris heard Lavely say, "Scab, you're going to get yours," but didn't think much of it. When Harris started to leave, he blew

---

14. The final determination of credibility rests with the Administrative Law Judge as long as he considers all relevant factors and sufficiently explains his resolutions. *Altemose Construction Co. v. N.L.R.B.*, 514 F.2d 8, 16 (3d Cir. 1975); *N.L.R.B. v. Wings and Wheels, Inc.*, 324 F.2d 495, 496 (3d Cir. 1963).

15. Charney's claim of threats by Petrosky was discredited. Holderbaum did not testify.

his horn but Lavely wouldn't move his truck and he had a rough time getting out.

In determining that Petrosky, Geisel and Lavely did not engage in conduct sufficiently egregious to deprive them of the protection of the Act, the Board stated:

> Although there are indications of instances in which they verbally abused or threatened replacements, this language was not accompanied by any physical acts or gestures that would provide added emphasis or meaning to their words sufficient to warrant finding that they should not be reinstated to their jobs at the strike's conclusion.

We believe that the Board applied an erroneous standard.

■■■ We recognize that some confrontations between strikers and non-strikers are inevitable and that not every impropriety is grounds for discharge.[16] Moreover, we recognize that it is the primary responsibility of the Board and not of the courts "to strike the proper balance between the asserted business justifications and the invasion of employee rights." *N.L.R.B. v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967). Yet, we do not believe that an employer must countenance conduct that amounts to intimidation and threats of bodily harm. Threats are not protected conduct under the Act,[17] and we fail to see how a threat acquires protected status simply because it is unaccompanied by physical acts or gestures. The question is whether a threat is sufficiently egregious not whether there is added emphasis.[18]

Some courts have used a subjective approach to evaluate threats. In *N.L.R.B. v. Efco Manufacturing Co.*, 227 F.2d 675, 676 (1st Cir.), *cert. denied*, 350 U.S. 1007, 76 S.Ct. 651, 100 L.Ed. 869 (1955), a striker's threat to beat up a plant manager was considered not egregious because the manager was not put in direct fear of a beating. But threats which placed a non-striker in fear of bodily harm so that he left work for five weeks were sufficiently egregious to deny reinstatement in *N.L.R.B. v. Trumbull Asphalt Co.*, 327 F.2d 841, 846 (8th Cir. 1964). The difficulty with this approach is that it focuses on the effect on the non-striker rather than on the conduct of the striker. Another approach is articulated in *N.L.R.B. v. Pepsi Cola Company of Lumberton, Inc.*, 496 F.2d 226 (4th Cir. 1974), where the court denied reinstatement of a striker who told a prospective employee, "I know where you live, and if you go in there to work, I'll come looking for you." The Fourth Circuit found that this "veiled threat" crossed the line from persuasion to threats and intimidation and stated, "We have drawn the line at conduct that is intended to threaten or intimidate non-strikers." *Id.* at 228. A contrary result was obtained in *N.L.R.B. v. Hartmann Luggage Co.*, 453 F.2d 178 (6th Cir. 1971), when the court focused on the intent of a striker who told a supervisor that it would be a shame for them to kill him. Enforcing reinstatement, the Sixth Circuit observed that the threat was picket line rhetoric, not literally intended.

■■■ Rather than focus on either the subjective intent of the striker or the perception of the "victim", we adopt an objective standard to determine whether conduct constitutes a threat sufficiently egregious to justify an employer's refusal to reinstate. In *Local 542, International Union of Oper-*

---

**16.** A "trivial rough incident" or "moment of animal exuberance" does not convert otherwise peaceful picketing into violence. *Milk Wagon Drivers Union v. Meadowmoor Dairies*, 312 U.S. 287, 293, 61 S.Ct. 552, 85 L.Ed. 836 (1940).

**17.** *See Allen Bradley Local No. 1111 v. Wisconsin Employment Relations Board*, 315 U.S. 740, 750, 62 S.Ct. 820, 86 L.Ed. 1154 (1942).

**18.** In *Firestone Tire and Rubber Co. v. N.L.R.B.*, 449 F.2d 511, 512 (5th Cir. 1971), the Fifth

Circuit concluded that a striker's vulgar invective was a threat of physical harm which amounted to serious misconduct warranting his discharge. Similarly, in *Federal Prescription Services, Inc. v. N.L.R.B.*, 496 F.2d 813, 818 (8th Cir.) *cert. denied*, 419 U.S. 1049, 95 S.Ct. 624, 42 L.Ed.2d 643 (1974), intimidation, verbal assaults and threats, in contravention of a court order, provided a justifiable basis upon which to deny reinstatement.

*ating Eng. v. N.L.R.B.,* 328 F.2d 850 (3d Cir.), *cert. denied,* 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964), this court set forth the test for union coercion and intimidation in violation of Section 8(b)(1)(A): [19]

> That no one was in fact coerced or intimidated is of no relevance. The test of coercion and intimidation is not whether the misconduct proves effective. The test is whether the misconduct is such that, under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act.

*Id.* at 852–853. We believe that this standard which this Circuit has adopted in the closely analogous situation of Section 8(b)(1)(A) violations, is equally applicable to threats and intimidation by individual strikers.

▌ Applying this standard, we agree with the Board that neither Petrosky nor Geisel engaged in conduct sufficiently egregious to deny reinstatement. Both used abusive language but it is well settled that the use of epithets, vulgar words or profanity does not deprive a striker of the protection of the Act.[20] Geisel's remark to Rice that next time he might not be so lucky is too ambiguous to reasonably tend to coerce or intimidate.

▌ Substantial evidence on the record indicates, however, that Lavely's conduct constituted threats which could reasonably tend to coerce or intimidate. He followed non-striker Kring to a delivery point and said he would "get him", shook his fist at Inston and said he would "knock the goddamn shit out of [him]" if he drove again, told truckdriver Harris, "Scab, you're going to get yours," and partially blocked Harris's egress. In the context of this strike, which was marked by incidents of vandalism and harassment, and under the circumstances in which the statements were made, Lavely's conduct was not merely spontaneous picket line activity. *Cf. N.L.R.B. v. Juniata Packing Company,* 464 F.2d 153, 156 (3d Cir. 1972). Accordingly, we deny enforcement of that part of the Board's order which orders Lavely's reinstatement.

## III.

### *The Nature of the Strike*

▌ The work stoppage that began on April 17, 1974, was an economic strike to secure union recognition. This characterization of the strike has significant consequence with respect to reinstatement rights. *NLRB v. Juniata Packing Co.,* 464 F.2d 153, 155 (3d Cir. 1972). An economic striker, as distinct from an unfair labor practice striker, who unconditionally requests reinstatement is entitled to his former position unless the employer has "legitimate and substantial business justifications" for refusing. *NLRB v. Great Dane Trailers,* 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). He may, however, be permanently replaced during the strike, and proof that such a replacement is on the job is recognized as an adequate justification for an employer's denial of reinstatement. *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 345–346, 58 S.Ct. 904, 82 L.Ed. 1381 (1936). The economic striker's status as an employee continues until he has obtained other regular and substantially equivalent employment and he is entitled to reinstatement "if and when a job for which [he] is qualified becomes available." *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 381, 88 S.Ct. 543, 547, 19 L.Ed.2d 614 (1967); *see also, Laidlaw Corp. v. NLRB,* 414 F.2d 99 (7th Cir. 1969), *cert. denied,* 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). In contrast, unfair labor practice strikers are entitled to reinstatement even if replacements

---

**19.** Section 8(b)(1)(A) makes it an unfair labor practice for a union to restrain or coerce employees in the exercise of Section 7 rights.

**20.** *E. g., Linn v. United Plant Guard Workers,* 383 U.S. 53, 60–61, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); *N.L.R.B. v. Cement Transport Inc.,* 490 F.2d 1024, 1030 n.7 (6th Cir.), *cert. denied,* 419 U.S. 828, 95 S.Ct. 47, 42 L.Ed.2d 52 (1974); *Crown Central Petroleum Corp. v. N.L.R.B.,* 430 F.2d 724, 731 n.27 (5th Cir. 1970); *Hugh H. Wilson Corp. v. N.L.R.B.,* 414 F.2d 1345, 1356 n.20 (3d Cir. 1969), *cert. denied,* 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970).

have been hired. *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

Although the General Counsel argued at the hearing that the strike was converted into an unfair labor practice strike on May 17, 1974, the Administrative Law Judge made no such finding.[21] Nor did the Board. We therefore analyze the Board's order in terms of an economic strike to determine whether the ordered remedy is appropriate. An understanding of the significant events which occurred after the strike is essential to our analysis.

### The Union's Offer

■ The Company's obligation to reinstate the striking workers depends in the first instance upon an unconditional offer by the strikers to return to work. *See N.L.R.B. v. Great Dane Trailers, supra.* Substantial evidence supports the Board's finding that the Union's offer on behalf of the strikers was *bona fide* and unconditional. The plain words of the Union's August 8, 1974, letter can have no other import. We do not question the Union's authority to act on behalf of the strikers. *See American Machinery Corp. v. N.L.R.B.,* 424 F.2d 1321, 1328 (5th Cir. 1970); *N.L.R.B. v. I. Posner, Inc.,* 304 F.2d 773 (2d Cir. 1962). Nor did the continued picketing at the main entrance to the terminal invalidate the Union's offer. *See Seminole Asphalt Refining Co.,* 207 NLRB 167 (1973), *enforced on this point,* 497 F.2d 247 (5th Cir. 1974); *Laidlaw Corp. v. N.L.R.B., supra* at 106.

### The Company's Letters of August 12 and 15 and Subsequent Delay

Our analysis of this issue pertains to all strikers other than the seven who were discharged for strike misconduct[22] and the nineteen dockworkers who received replace-ment letters.[23] The dockworkers' reinstatement rights will be discussed separately.

■ Stating that a valid offer of reinstatement must be specific, unequivocal and unconditional, the Administrative Law Judge found that the Company's letters of August 12 and 15, 1974 were no more than invitations to the strikers to seek reinstatement, rather than valid offers of reinstatement. We do not agree. While this court may not reject the Board's choice between two fairly conflicting views of the evidence, it is not barred from setting aside the Board's finding if it cannot "conscientiously find that the evidence supporting that decision is substantial". *Universal Camera Corp. v. N.L.R.B., supra* 340 U.S. at 488, 71 S.Ct. at 465.

■ The validity of the Company's offer must be determined from the face of the letters. The August 12 letter does inquire into the striker's intention to return and the earliest available date. It then states, "If you want your previous job, which is available, contact me as soon as possible." It establishes unequivocally that (1) there is a position for the striker; (2) that the position is on the same level of employment as the job which the striker left; (3) that the job is immediately available; and (4) that it requires no more than "contact" by the striker at the striker's initiative for reinstatement to that position. Clearly, this is far more than an inquiry into availability. Indeed, past Board decisions support our view that this letter constitutes a valid offer of reinstatement. In *American Enterprises, Inc.,* 200 NLRB 114 (1972), the employer wrote to dischargees and, as in this case, began by inquiring into their interest in returning to work. He then added, "We will hold the job open until Monday, August 31, 1970. Should you be interested, we would like to hear from you by then." The Board found that this satisfied the employ-

21. The Administrative Law Judge, without making any finding as to whether the strike was an economic strike or an unfair labor practice strike, assumed for purposes of his conclusion that the strike was an economic strike. Nevertheless, he applied the remedy which an unfair labor practice strike would require.

22. *See* n.8, *supra* and Part II text.

23. *See* n.9, *supra.*

er's obligation. In *Moro Motors, Ltd.,* 216 NLRB 192 (1975), an employer's question, "We are in a hole for mechanics, would you like to come back to work here?" constituted a valid offer of reinstatement.

Here, the Company's letter specifically referred to "your job". It, therefore, satisfied the requirement that the offer be for the same or substantially equivalent work.[24] *See Rushton & Mercier Woodworking Co.,* 203 NLRB 123 (1973); *Information Control Corp.,* 196 NLRB 504 (1972); *Crown Handbag of Calif.,* 137 NLRB 1162 (1962). Moreover, as the Board has stated on more than one occasion, "If the men had doubt, they could have inquired." *Centac Corp.,* 179 NLRB 313, 322 (1969). *Accord, Moro Motors Ltd., supra; American Enterprises Co., supra.*

With the exception of one incident,[25] all of the evidence relied upon by the Board as respects the quality of the Company's letters involves Company actions and statements made *after* the letters were sent. We believe that the validity of the offer must be determined by an evaluation and perspective as to whether the offer reasonably put strikers on notice that they were being offered reinstatement. Subsequent events are quite another matter.[26]

We agree with the Fourth Circuit's statement that:

> The Board may not dispense with the requirement for application when the employee has been in touch with neither the employer nor the union *unless circumstances show that the employer had already made clear an intention not to reinstate him.* (emphasis added)

*NLRB v. Pepsi Cola Co. of Lumberton, Inc., supra* at 229; *accord: N.L.R.B. v. Betts Baking Co.,* 428 F.2d 156 (10th Cir. 1970); *see also, Mississippi Steel Corp.,* 169 NLRB 647, 662 (1968). Neither the August 12 nor the August 15 letter, read separately or together, reveal a Company intention not to reinstate. To the contrary, the intention revealed is an explicit intention to reinstate. Both letters, when read together, set a deadline of August 23, 1974. Under all the circumstances, this deadline provided a reasonable period for strikers to respond. *See N.L.R.B. v. Betts Baking Co., supra* at 158 (eight days held reasonable).

Although we are satisfied with the unconditional quality of the Company's offer, there is substantial evidence to support the Board's finding that the Company violated Section 8(a)(3) by failing and refusing to reinstate the strikers. It is evident that the Company employed procedures which delayed reinstatement. Although the Union had made an unconditional offer, L. McQuaide insisted on individual interviews to determine if applicants were willing to work.[27] At the conclusion of the interviews, many were told that there were no current openings. Although the Company argued that substantial business justifications, such as scheduling changes, justified

---

**24.** The Administrative Law Judge stated that the letters did not instruct strikers to report for work at a designated time and place. We have, however, found no Board decision which requires such specificity. In any event, we are satisfied that the direction to "contact me as soon as possible", when viewed from the practical perspective of employer-employee communications and relations, leaves no doubt as to the place to which the employee should report or the time.

**25.** Striker Ken Christener testified that he sought reinstatement approximately one week before the letters were sent. W. McQuaide told him that "letters would be sent out for appointments." Whatever may be inferred from this remark, it does not alter the substance of the Company's letter.

**26.** There is nothing on the face of the letter to indicate that a response would be futile. *See Colecraft Manufacturing Co. v. NLRB,* 385 F.2d 998, 1005 (2nd Cir. 1967); *Eastern Die Co.,* 142 NLRB 601, 604 (1963). The Company's delaying tactics and unlawful interrogation of applicants occurred after the time for response had elapsed.

**27.** A similar procedure, which shifted the burden back to the strikers, was found to be an impermissible delay in *Newspaper Production Co. v. NLRB,* 503 F.2d 821, 826 (5th Cir. 1974). *See also, Retail, Wholesale and Department Store Union v. NLRB,* 151 U.S.App.D.C. 209, 466 F.2d 380, 385 (1972).

the delay, the Administrative Law Judge rejected this contention in light of the fact that the Company continued to hire new employees. We conclude that the finding of unjustifiable delay is supported by substantial evidence. *See NLRB v. Fleetwood Trailer Co., supra, Rogers Manufacturing Co. v. NLRB,* 486 F.2d 644 (6th Cir. 1973), *cert. denied,* 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 288 (1974); *Kayser Roth Hosiery Co. Inc. v. NLRB,* 447 F.2d 396 (6th Cir. 1971).

██ "Our power to enforce Board orders is equitable in nature and is properly invoked only when the relief sought is consistent with principles of equity." *C–B Buick Inc. v. NLRB,* 506 F.2d 1086, 1092 (3d Cir. 1974). Because the Company's violation was its delay and failure to reinstate strikers, rather than the making of a conditional and invalid offer of reinstatement, we direct modification of our enforcement order to remedy only the violation "for which there is an evidentiary basis." *N.L.R.B. v. Mears,* 437 F.2d 502, 507 (3d Cir. 1970). Accordingly, we will direct that the Board modify its order with respect to all unnamed strikers so that the Board's order requiring immediate reinstatement applies only to those strikers who responded to the Company's offer by August 23, 1974.

██ Although the Administrative Law Judge stated, and the record indicates, that the Company may have satisfied its obligation as to some strikers, no individual findings were made. Rather, findings in this respect were reserved for future compliance proceedings. Although the Company challenges this procedure, we recognize and approve such a reservation as appropriate. *NLRB v. J.H. Rutter-Rex Manufacturing*

*Co.,* 396 U.S. 258, 260, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); *Rogers Manufacturing Co. v. NLRB, supra* at 649; *NLRB v. Reliance Clay Products Co.,* 245 F.2d 599, 599–600 (5th Cir. 1957).

### The Replaced Dockworkers

There is considerable evidence in the record concerning replacements hired by the Company.[28] Although the General Counsel argued at the hearing that these replacements were not *bona fide,*[29] no such findings were made. Rather the Administrative Law Judge relied on the Company's August 8 statement before the Pennsylvania Employment Compensation Board of Review that it was ready, willing and able to take back any employees who wanted to come back. He concluded that this statement removed any distinction between economic and unfair labor practice strikers with respect to reinstatement.[30] We do not agree that the Company's "ready, willing and able" statement suffices to eliminate the need for factual findings concerning the replacements.

██ The employer bears the burden of showing that legitimate and substantial business reasons (including the hiring of replacements) justify his refusal to reinstate economic strikers. *N.L.R.B. v. Great Dane Trailers, supra* 388 U.S. at 34, 87 S.Ct. 1792. Here, the Company presented evidence concerning replacements. It may well be that these replacements are *bona fide* and that, therefore, the nineteen striking dockworkers were not entitled to reinstatement until substantially equivalent positions became available. On the other hand, it may well be that the replacements

---

**28.** During the month of May the Company hired twenty-four dockworkers. Of this number, ten were transferees from other departments, nine were high school seniors and three were teenage sons of Company principals.

**29.** *See, NLRB v. International Van Lines,* 409 U.S. 48, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972) (economic strikers discharged prior to the hiring of permanent replacements entitled to reinstatement with back pay).

**30.** We note that the Administrative Law Judge rejected the Company's statement as a valid offer of reinstatement, which would toll backpay, because it was not specific, unequivocal, and unconditional. Yet, he reasoned that this same statement was dispositive for purposes of determining reinstatement rights.

were not *bona fide* and, in that event, the nineteen dockworkers would be entitled to reinstatement on the same basis as the other strikers. Such determinations, however, must be based on factual findings concerning the evidence introduced and, as noted, the record is silent with respect to such findings.

In addition, we note that the Company's August 15, 1974, letter to replaced dockworkers stated:

"As you know on May 17, 1974, I wrote you a letter informing you that you were permanently replaced. I would appreciate hearing from you no later than Friday, August 23, 1974 if you have any desire to work again for W. C. McQuaide, Inc.

"If you are currently available and desire to fill a vacancy should one occur, please notify me of your intention no later than August 23, 1974. If possible, please convey this information to me at my office."

We read this letter as a recognition by the Company of its obligation to offer reinstatement, as jobs became available, to those replaced strikers who had not found "other regular and substantially equivalent employment." *NLRB v. Fleetwood Trailers Co., Inc., supra* 389 U.S. at 381, 88 S.Ct. at 547. The Company's request for notification of availability and interest is entirely reasonable and those who failed to respond should not be entitled to reinstatement. In *American Machinery Corp. v. NLRB*, 424 F.2d 1321 (5th Cir. 1970), the court observed that an employer might find means to cope with its obligation to replaced strikers:

For example, he might notify the strikers when they request reinstatement of a reasonable time during which their applications will be considered current and at the expiration of which they must take affirmative action to maintain that current status. A reasonable rule would not contravene *Fleetwood's* assertion that "[t]he right to reinstatement does not depend upon technicalities relating to application". 389 U.S. at 381, 88 S.Ct. at 547, 19 L.Ed. at 619. (footnote omitted.)

*Id.* at 1328.[31]

Accordingly, with respect to the reinstatement rights of the nineteen replaced dockworkers, we remand for factual findings (1) as to whether the hired replacements were *bona fide* and (2) as to which of the nineteen dockworkers responded to the Company's letter.

### The Status of R. J. Kessler

■ The Board found that R. J. Kessler was not a supervisor, as claimed by the Company.[32] Although Kessler did not testify, the Administrative Law Judge credited the testimony of Dennis Patterson who held a position on the dock similar to Kessler's. Kessler's main responsibility was to assign dockworkers to load or unload trucks. These assignments were made on the basis of dockworker availability and did not involve the exercise of independent judgment. Kessler did not have the authority to hire, fire or lay off employees.

This court has observed that determinations respecting supervisor status are particularly suited to the Board's expertise. *Mon River Towing, Inc. v. NLRB*, 421 F.2d 1, 5 (3d Cir. 1969). *See also Suburban Transit Corp. v. NLRB*, 499 F.2d 78 (3d Cir.), *cert. denied*, 419 U.S. 1089, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974). Substantial evidence in

31. Such a practice was employed in *Bio Science Laboratories v. NLRB*, 542 F.2d 505 (9th Cir. 1976). Replaced strikers' affirmative responses to letters inquiring whether they were interested in returning to their jobs qualified their votes in a decertification election.

32. § 2(11) of the Act defines a supervisor as: . . . any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

the record supports the Board's finding that Kessler was not a supervisor. Accordingly, this aspect of the Board's order will be enforced.

### IV.

### *The Section 8(a)(1) Violations*

The Administrative Law Judge found, and the Board affirmed, that the Company violated Section 8(a)(1) of the Act by coercively interrogating applicants for reinstatement.[33]

 To establish a violation of Section 8(a)(1) it need only be shown that under the circumstances, the employer's conduct "may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act." *NLRB v. Triangle Publications, Inc.,* 500 F.2d 597, 598 (3d Cir. 1974).[34] Moreover, in *Mon River Towing, Inc. v. NLRB, supra* at 9, this Court stated:

> As the economic dependence of employees on their employer may cause them to be peculiarly sensitive to nuances in language which would be lost on a neutral observer, the possibility that a statement contains an implied threat must be

judged from the employee's point of view. For that reason the expertise of the Board is particularly relevant to the determination of whether a latent threat lies hidden in the words of an employer. Whether an employer's statements are coercive is a question of fact for the Board, and the Board's determinations are conclusive if supported by substantial evidence. *NLRB v. Armcor Industries, Inc.,* 535 F.2d 239, 242 (3d Cir. 1976); *NLRB v. Dee's of New Jersey, Inc.,* 395 F.2d 112, 115 (3d Cir. 1968).

 Here, the strike had lasted four months and there were bitter feelings engendered on both sides. With the exception of Weyandt's meeting with L. McQuaide, see n.33, *supra,* all of the interviews with returning strikers occurred almost one month after the Union had made an unconditional offer of reinstatement. The delay between that offer and the Company's actions with respect to reinstatement undoubtedly is a substantial factor in evaluating the atmosphere of the interviews. Under the circumstances present here, the Board's findings of coercive interrogation and implied threats are supported by substantial evidence. We will therefore enforce the Board's order with respect to the Section 8(a)(1) violations.

---

**33.** During the course of interviews with strikers, the following occurred:

Robert Klimek was told by L. McQuaide that if he was for the Union, he could "just as well turn around and walk out right now." McQuaide also discussed the possible election and stated that he did "not need guys who were for the union and might cause trouble later."

L. McQuaide asked Stephen Edwards if he had learned anything by going out on strike and if he realized he could be put back to work for "less money" and "maybe not on the same job."

L. McQuaide asked Paul Sawko if he had been involved in vandalism and how he could be part of the Union. Sawko replied that he believed in the Union. McQuaide then said that he didn't know if he could trust Sawko again and would have to think about it.

Albert Liberfinger was asked why he had gone out on strike. He was told to fill out a job application and that there was no work at the present time.

L. McQuaide queried James Weyandt as to whether he was still interested in the Union

and added that if he was, and wouldn't vote for the Company, he didn't want him back.

L. McQuaide told Ken Christener that he "didn't think he had anything" for him but wanted to know if Christener knew anything about the vandalism. Christener replied that he wasn't guilty of anything. McQuaide then said that he didn't have anything at the moment but that if Christener should hear of any information that would be helpful, to call and he would appreciate it.

Norman Wright, an employee of ten years, was asked why he had not thought about seniority when he was out on the picket line and that the Union was not going to do him any big favors. L. McQuaide added that he could start Wright out at two dollars an hour "if he was so minded."

**34.** It should be recognized that this standard is the same standard established in *Local 542, International Union of Operating Eng. v. N.L.R.B., supra,* in a Section 8(b)(1)(A) context. It is also the standard to which we have subscribed in measuring strikers' conduct with respect to reinstatement or discharge. *See* Part II, *supra.*

534

## V.

### Conclusion

We will enforce so much of the Board's order as requires the Company to cease and desist from proscribed practices and which requires the posting of appropriate notices.

We will also enforce so much of the Board's order as requires reinstatement of John Geisel and Frank Petrosky, and all unnamed strikers who responded to the Company's offer by and including August 23, 1974.

With respect to the nineteen named dockworkers who received respondent's letters (*see* note 9 *supra* and III "The Replaced Dockworkers") we will remand for the factual findings required by and consistent with this opinion.

In all other respects in which enforcement of the Board's order has been sought, it will be denied.