**NOT PRECEDENTIAL**

# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

No. 16-1330

NATIONAL LABOR RELATIONS BOARD,
                                        Petitioner


v.


SUB ACUTE REHABILITATION CENTER AT KEARNY, LLC
d/b/a Belgrove Post Acute Care Center,
                                        Respondent



No. 16-1505


SUB ACUTE REHABILITATION CENTER AT KEARNY,
d/b/a Belgrove Post Acute Care Center,
                                        Petitioner


v.


NATIONAL LABOR RELATIONS BOARD,
                                        Respondent

---

On Application for Enforcement and
Cross-Petition for Review of an Order of the
National Labor Relations Board
(NLRB-1:22-CA-093626)

---

Submitted under Third Circuit L.A.R. 34.1(a)
on November 7, 2016

(Opinion filed: January 11, 2017)


Before:  JORDAN, GREENAWAY, JR., and RENDELL, Circuit Judges

**RENDELL**, Senior Circuit Judge:

Belgrove Post Acute Care Center ("Belgrove"), the employer in this case, challenges the determination of the National Labor Relations Board ("the Board") that its Licensed Practical Nurses ("LPNs") were not statutory supervisors under Section 2(11) of the National Labor Relations Act ("the Act"). Because we find that substantial evidence supports the Board's determination, we will reject Belgrove's Petition for Review and grant the Board's Application for Enforcement.

## I. Background

Belgrove runs a 24-hour/7-day a week, 120-bed, sub-acute care facility.[1] Belgrove employees approximately 30 LPNs and 75 Certified Nursing Assistants ("CNAs") who work on three floors, covering three shifts per day. The Director of Nursing oversees the entire nursing department, and reporting to the Director are the Assistant Director of Nursing, two house supervisors, and three unit managers. House supervisors assign staff, monitor the entire building, and ensure that staff arrive on time and properly perform their jobs. Unit managers, who oversee each floor, assign work to LPNs and ensure that LPNs do their jobs. LPNs primarily serve as floor nurses. In that capacity, LPNs perform

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] Acute care refers to the type of care provided in a hospital setting. Sub-acute care, which is the service Belgrove provides, refers to a broad range of post-hospital care services such as nursing care, physical and occupational rehabilitation, or speech therapy.

treatments for patients and distribute medications. Sometimes, an LPN will fill in for a unit manager or house supervisor when that person is out sick or on vacation. Finally, CNAs, who are assigned tasks by the LPNs, provide basic living care by feeding, bathing, grooming, and dressing the patients.

In 2012, District 1199J of the National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO filed a petition to represent Belgrove's LPNs. Belgrove responded that LPNs were statutory supervisors under the Act (which would preclude them from forming a collective bargaining unit) for two reasons: first, that LPNs, in their capacity as floor nurses, satisfied four of the supervisory categories under Section 2(11), and second, that LPNs, by virtue of their temporary service as unit managers or house supervisors, also qualified as supervisors under the Act. At the representation hearing, Belgrove presented two witnesses: Jaqueline Baumrind, Belgrove's top administrator, and Josefina Naglieri, an LPN at Belgrove. The record before the Regional Director also contained documents such as the LPN job description, examples of unit staffing sheets, CNA assignment sheets, and disciplinary records.

The Regional Director subsequently issued a Decision and Direction of Election finding that LPNs were not supervisors. The Board denied review and certified the Union as the bargaining representative. Belgrove thereafter refused to bargain with the Union. The Regional Director responded by filing an unfair labor practices charge against Belgrove, and on December 9, 2015, the Board granted the General Counsel's Motion for Summary Judgment, thereby affirming the Regional Director's conclusion that LPNs

3

were not supervisors.[2] Belgrove petitions for review and the Board seeks enforcement of the December 9, 2015 order.

## II. Standard of Review

"[D]eterminations respecting supervisor status are particularly suited to the Board's expertise." *Mars Home for Youth v. NLRB*, 666 F.3d 850, 853 (3d Cir. 2011) (quoting *NLRB v. W.C. McQuaide Inc.*, 552 F.2d 519, 532 (3d Cir. 1977)). Accordingly, our review of the Board's determination of the LPN's status is limited. We will uphold a Board's finding of supervisory status under the Act so long as there is substantial evidence to support the Board's conclusion. *Id.* "Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). We exercise plenary review over the Board's legal determinations, but do so "with due deference to the Board's expertise in labor matters." *NLRB v. St. George Warehouse, Inc.*, 645 F.3d 666, 671 (3d Cir. 2011) (internal quotation marks omitted). We will also "uphold the Board's interpretations of the Act if they are reasonable." *MCPC Inc. v. NLRB*, 813 F.3d 475, 482 (3d Cir. 2016). Finally, we analyze the Regional Director's findings of fact and conclusions of law where the Board adopted those findings. *See Trafford Distrib. Ctr. v. NLRB*, 478 F.3d 172, 179 (3d Cir. 2007). Where the Board has adopted the Regional Director's decision in part, we will review both. *Id.*

---

[2] The Board initially affirmed the Regional Director's determination on March 13, 2013. The Board's General Counsel then applied for enforcement of that order in this Court. We remanded the case, however, for further proceedings in light of *NLRB v. Noel Canning*, 134 S. Ct. 2250 (2014). The December 9, 2015 order constitutes the operative order in this case.

### III. Analysis[3]

We begin by stating the legal principles that guide the Board's supervisory status determination. Only employees are entitled to the Act's protections. *See* 29 U.S.C. § 152. "Supervisors," however, are excluded from the definition of "employee." *Id*. A supervisor is:

> [A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). Thus, employees are supervisors if "(1) they hold the authority to engage in any 1 of the 12 listed supervisory functions, (2) their exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment, and (3) their authority is held in the interest of the employer." *NLRB v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 713 (2001) (internal quotation marks omitted).

The Board's interpretation of independent judgment turns on the "degree" of discretion exercised by a putative supervisor. *In re Oakwood Healthcare, Inc.*, 348 N.L.R.B. 686, 693 (2006). A person exercises independent judgment if she "act[s], or effectively recommend[s] action, free of the control of others and form[s] an opinion or evaluation by discerning and comparing data." *Id*. Judgment is not independent, however, if it is "dictated or controlled by detailed instructions, whether set forth in company

---

[3] The Board had jurisdiction over the case pursuant to Section 10(a) of the Act. We have jurisdiction over the Board's Application for Enforcement and Belgrove's Petition for Review of the Board's December 9, 2015 order, a final order, under Section 10(e) and (f) of the act, respectively. 29 U.S.C. §§ 160(e), (f).

policies or rules, the verbal instructions of a higher authority, or in the provisions of a collective bargaining agreement." *Id.* Moreover, for judgment to be independent, it must "rise[] above the 'routine or clerical.'" *Id.*

We have previously approved of this standard. *See Mars Home for Youth*, 666 F.3d at 854 (citing *Oakwood*, 348 N.L.R.B. at 692-93). It is consistent with Section 2(11) of the Act, which seeks to distinguish true supervisors who exercise "genuine management prerogatives" with "straw bosses, leadmen, [and] set-up men," who are still entitled to the Act's protections despite the exercise of "minor supervisory duties." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 280-81 (1974) (quoting S. Rep. No. 80-105, 4 (1947)). Moreover, by focusing on the "degree" of discretion exercised, it faithfully implements the Supreme Court's guidance in *Kentucky River*, which noted that "detailed orders and regulations issued by the employer" might preclude a finding of independent judgment. *Kentucky River*, 532 U.S. at 714. Therefore, we defer to the Board's interpretation. *See, e.g.*, *Palmetto Prince George Operating, LLC v. NLRB*, 841 F.3d 211, 216 (4th Cir. 2016) (finding that "the Board adopted a reasonable interpretation of 'independent judgment'").

Finally, as the party claiming supervisory status, Belgrove bears the burden of establishing it. *See Mars Home for Youth*, 666 F.3d at 854.

With these principles in mind, we turn to address each of Belgrove's five bases for finding supervisor status. Ultimately, we disagree with its arguments and will deny its Petition.

## A. LPNs as Floor Nurses

### 1. Assignment

First, Belgrove asserts that LPNs who serve as floor nurses are supervisors because they assign CNAs and assign work to the CNAs. The Regional Director found that floor nurses did not assign CNAs within the meaning of Section 2(11), and in the alternative, that LPNs did not exercise independent judgment because Belgrove "ha[d] not shown that [floor nurses] perform a detailed analysis of CNAs' abilities and residents' needs." A.438. The Board affirmed the Regional Director on this alternative ground. Belgrove argues this alternative conclusion lacked substantial evidence. We disagree.

The record supports the Board's conclusion that LPNs do not use independent judgment in their assignments. CNAs are assigned to particular time shifts and units not by floor nurses, but by the facility's staffing coordinator. Floor nurses might fill out standard assignment sheets that assign CNAs to particular room blocks, break times, and other routine daily tasks such as dining room duty, pantry clean-up duty, fire team duty, and patient transfer duty. However, as the Regional Director noted, LPN Naglieri testified that she can choose *any* CNA to perform any of these tasks. Moreover, to the extent LPNs assigned other discrete tasks, those tasks involved similarly routine "activities of daily living," A.53, such as getting a resident dressed for a therapy appointment, cleaning up vomit, or cleaning a patient before discharge. Thus, the Regional Director was entitled to conclude that floor nurse "assignment[s]" were "largely

7

defined by the routine nature of the daily living functions with which [CNAs] assist" and did not involve independent judgment. A.438.

Belgrove counters by pointing to LPN Naglieri's testimony that she assigns CNAs "based on the skill level of the CNA." A.184. The Regional Director concluded that this "vague assertion," in light of the specific examples offered elsewhere in her testimony, failed to show supervisory status. A.438. We agree with the Regional Director. The statute requires "evidence of actual supervisory authority visibly demonstrated by tangible examples to establish the existence of such authority." *Bldg. Contractors Ass'n*, 364 N.L.R.B. No. 74 (Aug. 16, 2016) (quoting *Oil Workers v. NLRB*, 455 F.2d 237, 243 (D.C. Cir. 1971)); *see also Frenchtown Acquisition Co. v. NLRB*, 683 F.3d 298, 305 (6th Cir. 2012) ("General testimony asserting that employees have supervisory responsibilities is not sufficient to satisfy the burden of proof when there is no specific evidence supporting the testimony."); *Golden Crest Healthcare Center*, 348 N.L.R.B. 727, 731 (2006) (recognizing that "purely conclusory evidence is not sufficient to establish supervisory status"). The specific examples offered by Naglieri did not actually show the exercise of independent judgment and therefore did not support her conclusory assertion. Naglieri testified that she transferred CNAs, but only because a resident asked her to do so. The record contains another example of her directing a CNA to change the order of tasks the CNA performed but only because that resident had a doctor's appointment. Naglieri similarly adjusted CNA assignments when relaying a doctor's orders, *i.e.*, orders from a higher authority. These routine adjustments do not evidence any analysis of CNA skill sets, and therefore do not demonstrate independent judgment. *See Frenchtown*

8

*Acquisition Co.*, 683 F.3d at 312 (finding that "routine adjustments to patient assignments, such as pulling an aide from a resident because a resident requests it" did not involve independent judgment). Thus, the Regional Director was entitled to discount Naglieri's conclusory assertion.[4]

### 2. Responsible Direction

Second, Belgrove asserts that floor nurses are supervisors because they responsibly direct CNAs. For direction to be responsible, "the person directing and performing the oversight of the employee must be accountable for the performance of the task by the other, such that some adverse consequence may befall the one providing the oversight if the tasks performed by the employee are not performed properly." *Mars Home for Youth*, 666 F.3d at 854 (citing *Oakwood*, 348 N.L.R.B. at 691-92); *see id.* at 854 n.2 (finding interpretation of responsible direction reasonable). Thus, to establish accountability for purposes of responsible direction, the employer must show it "delegated to the putative supervisor the authority to direct the work and the authority to take corrective action, if necessary[,]" and "that there is a prospect of adverse consequences" for failing to do so. *Oakwood*, 348 N.L.R.B. at 692.

_____

[4] We also reject Belgrove's argument that the Board added an additional requirement not present under the Act by requiring a "detailed analysis." Belgrove Reply 11-12. When viewed in context, however, we read the Regional Director's reference to "detailed analysis" to be merely shorthand for *Oakwood*'s independent judgment requirement, which the Regional Director not only cites but also quotes at length. The Regional Director also noted the extent to which LPNs must consider the "specialized training or skills" of the CNAs and routineness of the tasks which they were assigned, all considerations relevant to whether LPNs "discern[] and compar[e] data." A.438. This analysis faithfully applies *Oakwood*.

The Regional Director concluded that floor nurses did not responsibly direct CNAs because the record lacked evidence that floor nurses "risk[ed] a real prospect of adverse action for CNAs' poor performance." A.439. Belgrove concedes that no actual episodes of LPNs being disciplined exist in the record, but argues that LPN Naglieri's responses to hypothetical situations of deficient CNA performance or insubordination suffice to show prospective consequences.

We find, however, that the Regional Director reasonably concluded that Belgrove failed to meet its evidentiary burden. Belgrove points to the LPN job description, which states that LPNs "supervise[] and coordinate[] nursing personnel." A.264. But, as the Board recognized, the job description, which in any case does not reference CNAs specifically, constitutes only paper accountability that does not by itself establish supervisory authority. *See Golden Crest*, 348 N.L.R.B. at 731 ("[T]here must be a more-than-merely-paper showing that such a prospect exists."). As Belgrove concedes, there were no examples of a supervisor's disciplining a floor nurse for her failure to oversee the work of a CNA. Indeed, the only specific example of LPN Naglieri's actually being disciplined for a CNA's deficient performance occurred while Naglieri was acting as a unit manager, not a floor nurse.

Belgrove responds by citing Baumrind's and Naglieri's testimony that floor nurses were held responsible and were "basically instructed" on the possibility of being held responsible, A.215, and argues that this sufficed to show a *prospect* of consequences. In its view, actual examples are not required. *See* Belgrove Reply 11-12 (citing *Lakeland Health Care Assoc., LLC v. NLRB*, 696 F.3d 1332, 1346 (11th Cir. 2012)). To begin, we

10

note that the Regional Director did not require Belgrove to show that a floor nurse had actually been disciplined for failing to oversee CNAs. Instead, the Regional Director focused on the lack of *any* evidence—actual or circumstantial—supporting the existence of such accountability. The Regional Director noted that the record contained no evidence to show that this accountability might affect a floor nurse's "terms and conditions of employment." *Golden Crest*, 348 N.L.R.B. at 731. Indeed, there was no testimony, for example, that LPN performance reviews included a criterion for CNA management nor any written policy in the record that floor nurses might face progressive discipline for oversight failures. Further, Baumrind failed to identify even specific *hypothetical* examples of conduct that would trigger some form of accountability. *Cf. Lakeland Health Care Assoc.*, 696 F.3d at 1346 (recounting three specific hypotheticals proffered by the employer's director of nursing). Therefore, on this record, the Regional Director was entitled to conclude that Belgrove failed to show that LPNs faced even a prospect of adverse consequences. *See NSTAR Elec. Co.*, 798 F.3d at 17.

### 3. Suspend, Discharge, Discipline

Third, Belgrove contends floor nurses are supervisors because they discipline CNAs. The Regional Director found that given the "paucity of evidence adduced regarding floor nurses issuing discipline, [Belgrove] has not satisfied its burden to prove that floor nurses possess and exercise the authority to discipline CNAs." A.441.

Here, again, we agree with the Board and Regional Director that Belgrove failed to satisfy its burden. The evidence contained no record of LPNs formally disciplining CNAs under Belgrove's progressive discipline policy, and only three instances of

11

Naglieri's issuing written warnings to CNAs. However, in those instances, Naglieri disciplined in her capacity as acting unit manager. We also find unpersuasive, in light of the record, Belgrove's argument that floor nurses' verbal warnings and "write ups" constitute discipline because they affect CNA job status. Naglieri did testify that she has issued verbal warnings as a floor nurse. It is not clear, however, that Naglieri's verbal warnings played any role in Belgrove's progressive discipline policy. At most, the record shows that floor nurses make a note of a verbal warning that would "be left for the director of nursing and the administrator for when they came back into the building." A.177. Unlike house supervisors, who appear to have the authority to add notes to employee files, floor nurses only "communicate[]" the incident to their superiors, who then determine what course of action to take. A.74. Administrator Baumrind's specific example also highlighted Belgrove's evidentiary deficiency. She referenced only one incident where a floor nurse issued a verbal reprimand to a CNA who was taking an unauthorized break. But Baumrind could not recall whether any notation had been made in the CNA's file and could only say that Belgrove's policy requires the Director of Nursing to follow up. Accordingly, we see no reason to disturb the Regional Director's conclusion that Belgrove failed to show that floor nurses discipline CNAs.

### 4. Adjust Grievances

Belgrove finally asserts that floor nurses are supervisors because they adjust grievances. The Regional Director rejected this statutory basis to finding supervisory status, concluding that minor grievances such as personality conflicts between CNAs are not sufficient to confer supervisory status. The Board held, as an alternative ground, that

12

regardless of whether the grievance was major or minor, the floor nurses did not use independent judgment. On appeal, Belgrove asserts that floor nurses clearly adjust grievances because if the CNA has a problem with a resident, the floor nurse can reassign the CNA to another resident. It is unclear, as the Board points out, however, that resolution of patient complaints is relevant to this assessment. Regardless, as we noted above, there is no evidence that LPN Naglieri used independent judgment in transferring or assigning CNAs. Thus, we reject Belgrove's argument as to this basis.

### B. LPNs serving as Unit Managers or House Supervisors

Alternatively, Belgrove urges that occasional LPN service as unit manager or house supervisor renders them supervisors within the meaning of the Act. The Regional Director never considered whether persons in these positions exercised supervisory authority and instead found that LPNs did not spend sufficient time in those positions to warrant further consideration of its claim.

The Board considers an employee who spends "part of the time as a supervisor and the rest of the time as a unit employee" to be a supervisor under the Act when that employee "spends a regular and substantial portion of his/her work time performing supervisory functions." *Oakwood*, 348 N.L.R.B. at 694. "'[R]egular' means according to a pattern or schedule, as opposed [to] sporadic substitution." *Id*. Although the Board has not adopted a strict numerical definition of regular or substantial, it has found that employees that spend ten or fifteen percent of their total time performing supervisory functions constitute supervisors. *Id.* (citing *Swift & Co*, 129 N.L.R.B. 1391 (1961); *Archer Mills Inc.*, 115 N.L.R.B. 674 (1956)).

13

Here, Belgrove argues that its records show that LPNs acted as unit manager or house supervisor more than fifteen percent of the time. But LPNs who served in those positions did so only temporarily and sporadically, either because a particular unit manager or house supervisor took the day off, went on vacation, or the position became vacant. When the person returned or the position was filled, LPNs returned to their regular service as floor nurses. Indeed, there was also evidence in the record that only Registered Nurses could fill the positions on a full-time basis.

We do not think Belgrove's cited authority, *NLRB v. Florida Agr. Supply Co., Div. of Plymouth Cordage Co.*, 328 F.2d 989 (5th Cir. 1964), helps its argument either. There, the court found that mechanics were supervisors where they regularly spent three months of the year performing supervisory duties, while spending only five percent of remaining nine months on such duties. Here, although Naglieri's temporary service was quite lengthy, there was no evidence that LPNs served on a regular schedule. The staffing coordinator would simply call an LPN who she thought might volunteer to fill in. We therefore conclude that the record supported the Board's conclusion that LPN service as unit managers or house supervisors did not confer supervisory status under the Act.

### III. Conclusion

For the foregoing reasons, we find that substantial evidence supported the Board's conclusion that Belgrove's LPNs were not statutory supervisors under Section 2(11) of the Act. Accordingly, Belgrove's Petition for Review is DENIED. The NLRB's Application for Enforcement of its Order is GRANTED.