**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HRIBAR TRUCKING, INC., Respondent.**

**No. 16791.**

United States Court of Appeals
Seventh Circuit.

Jan. 31, 1969.

Rehearing Denied March 7, 1969.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., Washington, D. C., for petitioner.

Walter S. Davis, Russ R. Mueller, Milwaukee, Wis., for respondent.

Before DUFFY, Senior Circuit Judge, and KILEY and FAIRCHILD, Circuit Judges.

KILEY, Circuit Judge.

The Labor Board's petition seeks enforcement of its order finding violations of Sec. 8(a) (3) and (1), Sec. 8(a) (5) and (1), and Sec. 8(a) (1), of the National Labor Relations Act [1], respectively, in respondent Company's discharge of employees Pagels and Schultz, in unilaterally changing terms and conditions of employment, and in "interfering, restraining and coercing" employees in the exercise of their Sec. 7 organizational rights. We enforce the order with respect to the Sec. 8(a) (3) and (1) and Sec. 8(a) (1) findings, and deny enforcement of the Sec. 8(a) (5) and (1) finding.

The Company, located in Wisconsin, is in the business of transportation by motor carrier of sand, gravel, and similar materials. It is owned and controlled by members of the Hribar family. Leo Hribar, Jr., is president, his son Lee R. a vice-president, and his son Donald a director. It employs drivers for its own equipment and leases equipment from other owner-operators. Since 1958 the Company has had bargaining agreements with the Teamsters Union [2] covering its drivers, and in the new agreement of September 30, 1965, covering also the owner-operators.

Driver Pagels was named Union steward for the Company drivers shortly after the new agreement was made. On Friday, December 3, 1965, Schultz, steward for the owner-operators, went to the Company office to collect pay checks. The checks were not ready, and someone "broke off" the conversation. Schultz himself received his check later that afternoon. The next day, Saturday, Lothar-notified Lotharius, the Union business agent. He called President Hribar, who ius again called President Hribar asking that the unpaid owner-operators be paid that day. Hribar told him that could not be done because the office was closed on Saturday. Lotharius then stated that if the men were not paid they would not work Monday.

President Hribar called Pagels on Sunday to tell him where to report for work on Monday. Pagels told him there would be a strike Monday and until the owner-operators were given their checks. On Monday the men received their checks and were then available for work. Hri-

---

1.  29 U.S.C. § 151 et seq.

2.  Teamsters, Chauffeurs and Helpers Union, Local No. 43, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO.

bar said no work was available until Tuesday, December 7.

On December 7 Pagels and Schultz were notified by letter of their discharges for violation of Article VII of the bargaining agreement by taking "strike action." The letter to Pagels also stated that he was being discharged for having failed to secure his own insurance coverage. The Union protested and filed grievances over the discharges. The Company denied the grievances which were then submitted to arbitration. The arbitrator found Pagels and Schultz were discharged, not for cause, but because of their work as Union stewards; that the Company harbored "obvious" animus toward Pagels after his appointment as steward; and that his strike activities did not violate the agreement. He ordered Pagels and Schultz reinstated with compensation for time lost because of the discharges. The award was filed July 27, 1966, Pagels was reinstated August 5, and he was again discharged August 19, 1966. Before this final discharge, Hribar asked Pagels whether he had obtained his own insurance coverage. When Pagels answered that he had not, he was discharged, and has not worked for the Company since that time.

■ There is no merit in the Company's contention that the discharges of December 7, 1965, were for cause since the two employees took unauthorized strike action and breached the no-strike provision of the bargaining agreement. There is substantial uncontroverted evidence upon which the Examiner found that the December 6, 1965, strike was authorized, not by Pagels and Schultz, but by official Union action and that Pagels and Schultz had not taken "unauthorized strike action" in violation of Article VII of the agreement. It is the final, August 19, 1966, discharge which is the important issue before us.

The insurance referred to by Hribar before the August 19 discharge was provided in an agreement made November 17, 1965, between the Company and the Union. The agreement was the climax of developments following the Company's

insurer's decision not to renew its coverage and a successor insurer's group policy condition that it evaluate each Company driver's safety record. Hribar was asked to have each driver fill out a "Driver's Traffic Safety Record" listing all violations and accidents of the previous three years.

Hribar began calling the drivers in during May, 1965, to fill out the forms. Pagels, Schultz and the other drivers filled out forms with the aid of Hribar, who, according to testimony, was not faithful in the process to his duty to cooperate with the insurer. The reports were not given by the Company to the broker until "some time in September." In November, memoranda were received from the insurer by the Company's insurance broker, Carroll, with respect to employees Pagels, Regeth, Sweeris, Klingbeil, Kau and Novak. Each memorandum, except as to Regeth, recommended that the driver be relieved of driving duties.

Carroll called Hribar to set up a conference for discussion of the memoranda. Before a meeting could be arranged, Hribar called Carroll asking him to bring the reports of Pagels and Sweeris to a grievance meeting. On November 10, the meeting was breaking up as Carroll arrived, and the subject was added to the agenda for the November 17 meeting. At this meeting, when the Company urged discharges of Pagels and Sweeris, Pagels insisted that other drivers had records as bad as or worse than his. Union representatives and Pagels asked the Company about memoranda concerning other drivers. The Company did not give information about Novak and Kau, although it apparently knew of the insurance company's recommendations as to those drivers. At the conclusion of the meeting, the Union and the Company signed the agreement that three employees, including Pagels, would be given fifteen days to obtain their own insurance. On November 22, the Company furnished Pagels with information on insurance coverage. On December 7 Pagels and Sweeris were discharged.

The Board approved the findings of the Examiner that Hribar had said at the meeting that no word about any drivers besides Pagels, Sweeris and Regeth was sent to the Company by the insurer; that on November 17 Sweeris had not been on the payroll since November 5 and that this information was not disclosed at the meeting; that the agreed requirement that Pagels, Sweeris and Regeth secure their own insurance was induced by the Company's withholding of memoranda about drivers Novak and Kau at the meeting; and that Novak and Kau were never required to furnish their own insurance.

This conduct of the Company, the Board decided, was designed to effectuate the discriminatory discharge of Pagels. It seems as though the only recommendation of the insurer which troubled the Company was that respecting Pagels. He and a Union business agent testified that Hribar declared at the meeting that "no letter" about any of the others had been received. There is testimony also of a statement of Donald Hribar the night of Pagels' reinstatement in which Hribar offered to stop insisting on the insurance requirement if Pagels would stop pushing the Union.

These findings have substantial basis in the record as a whole, in the light of well justified findings of animus on the part of the Company against Pagels, commencing after his Union stewardship. There is ample testimony of statements of Leo and Donald Hribar from which the inference of animus, and interference with Union activities, could be reasonably drawn.

The Board found that President Hribar deliberately misled the Union at the November 17 meeting by withholding material relevant facts on the "insurance problem" for the purpose of effectuating Pagels' discriminatory discharge using the insurer's recommendation as a pretext.

■ The Board found, with substantial evidentiary support, that Donald Hribar was "at all times material" the Company's agent whose conduct bound the Company. The uncontradicted testimony is that when Hribar, then twenty-four years old, made the statement to Pagels, he had been a director for three years, and that occasionally he passed orders on to drivers. The Board's finding is challenged, without citation of authority, on the thin ground that if there was an agency relationship it was "an agency * * * only in the loosest sense"; and on argument that Hribar did not know what it meant to be a director, did not know who the other directors were, and was merely a mechanic paid on an hourly basis. We see no merit in the challenge.

■ We are not persuaded by the Company arguments that the findings as to the insurance issue are not substantiated by the record as a whole. Merely because steward Pagels "knew" Sweeris had quit work, the Board was not required to refrain from finding significance in the Company's urging, at the November 17 meeting, of Sweeris' discharge for failing to obtain insurance; nor was the Board required to refrain from implying discrimination as to Pagels because Carroll, the broker handling the Company insurance, had marked the Regeth memo "N.G.," despite the fact that no insurer memorandum—like those with respect to Pagels, Sweeris, Novak and Kau—was sent with respect to Regeth; nor was the Board required to refrain from finding significance in failure of the Company to tell the Union at the meeting that an insurer memorandum like the one with respect to Pagels had been received with respect to Novak and Kau because the latter two were not part of the Union agenda, or because they presented different problems as owner-operators or had less serious traffic safety records.

The record demonstrates, in our opinion, that the Board could well find that the Company used Pagels' failure to obtain insurance as a pretext for discharging Pagels on December 7, and that in the discharge on August 19, after reinstatement, the Company again used the

failure to obtain insurance as a pretext for discharging Pagels. The Board was not required to infer from Pagels' persistent refusal and failure to obtain the insurance, in the light of the testimony with respect to the Company's discrimination against Pagels, that the discharge of Pagels was not because of his Union activities. The findings have substantial support in the record as a whole and the conclusion, based on the findings, of Sec. 8(a) (1) and 8(a) (3) violations is not erroneous. NLRB v. Symons Mfg. Co., 328 F.2d 835, 837 (7th Cir. 1964).

The Company claims that the arbitrator's award resolved all the material issues, before us, and that the Board erred in not deferring to the award with respect to the requirement that Pagels obtain the insurance. It argues that the insurance requirement in the award implies that the arbitrator decided against the Board on this point and that the Board erroneously substituted its judgment for that of the arbitrator. This claim was made at the hearing, but was rejected in the Board's decision. The Board found that the insurance requirement in the award "perpetuated" the discriminatory requirement in the November 17 agreement and was "repugnant to the purposes and policy of the National Labor Relations Act."

■ We recognize the value which the courts attribute to the decisions of arbitrators in performing their function in the grievance process, to perpetuate the purpose of industrial peace underlying the Act. But we think it is plain that once having effectually found that the insurance requirement provided in the November 17 agreement discriminated against Pagels, it was clearly not within the power of the arbitrator to require Pagels to comply with the discriminatory provision of the November 17 agreement. In our view, the Board could, on this record, without abusing its discretion, conclude that the arbitrator's requirement that Pagels obtain insurance within fifteen days of his reinstatement was repugnant to the purposes and policy of

the Act. Carey v. Westinghouse Electric Corp., 375 U.S. 261, 270–272, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964).

■ We are of the opinion, however, that the evidence in the record does not give substantial support to the Board's finding that by unilaterally making changes in the owner-operator lease, the Company violated Sec. 8(a) (5) of the Act. The lease had provided that any conflict in the lease with the collective bargaining agreement would be null and void. The Public Service Commission of Wisconsin demanded that a clause make clear that "provisions of Chapter 60 of the Public Service Code were paramount." This inclusion did nothing more than state that which already was the law. The second change added the wording "during the entire period of the lease" to the provision that possession, control and responsibility for the truck remained with the lessee. There is no indication that the clause ever had been thought to mean anything else.

These additions were required by law. Furthermore, they did not alter the agreement of the parties, but rather made the wording of the lease comply with the Public Service Commission's requirements. They did not change the terms with respect to wages, hours or working conditions. We hold that this action did not violate Sec. 8(a) (5) of the Act, previous decisions not being to the contrary. See NLRB v. Harris, 200 F.2d 656 (5th Cir. 1953); NLRB v. Central Illinois Public Service Co., 324 F.2d 916 (7th Cir. 1963).

The Board's order will be enforced with respect to the 8(a) (1) and 8(a) (3) violations, but will not be enforced with respect to the 8(a) (5) charge.

DUFFY, Senior Circuit Judge (dissenting).

I respectfully dissent. I think the Labor Board should do something more than to give lip service to deferring to arbitration where the labor contract in question provides for arbitration, and such arbitration procedure is in process, as was the case here.

Pursuant to the collective bargaining agreement involved in this case, the discharges of Pagels and Schultz were submitted to arbitration. The arbitration hearing lasted two days. By the labor contract, the parties were bound to comply with the arbitration award or subject themselves to legal and economic consequences. At the arbitration hearing, the parties stipulated that the award was to be final and binding. There is no claim here by anyone that the arbitration proceeding was improperly or unfairly conducted.

During the period in question, respondent had a serious problem in maintaining insurance coverage. In February 1965, the Company was informed that its coverage, due to expire in April, would not be renewed. Thereafter, Carroll, an insurance broker, was able to secure a policy from Fireman's Fund Insurance Company. The policy was conditioned on the institution of a "loss control program." The principal aspect of this program was an evaluation of each driver's record.

The Union and the Company signed an agreement that three employees, including Pagels, would be given fifteen days to obtain their own insurance. On November 22, the respondent furnished Pagels with information on insurance coverage. Fifteen days later Pagels was discharged after the Company ascertained he had not taken out insurance.

The majority opinion criticizes Hribar for not adequately cooperating with the insurer; yet, it supports the Board's decision herein because Hribar required Pagels to obtain his own insurance which was in accord with the arbitrator's decision and also with the agreement made with the Union.

In a brief filed by the Labor Board in another case pending in this Court,[1] the Board states that "In general, the Board will decline to make a finding of an unfair labor practice violation and will defer to arbitration where the parties have already obtained an arbitrator's decision, or are in the process of obtaining such a decision, and where it is 'reasonably probable that an arbitrated settlement of the contract dispute would also put at rest the unfair labor practice controversy in a manner sufficient to effectuate the policies of the Act.' "

In the case before us, the arbitration proceeding was pending and was decided before the Labor Board's decision. It seems to me the Labor Board gives only lip service to deferring to arbitration proceedings. If it does not fully agree with what an arbitrator decides, the Board seems ready to hold that such a proceeding did not "put at rest the unfair labor practice controversy in a manner sufficient to effectuate the policies of the Act."

In my view, the Board's order with respect to alleged violations of Sections 8 (a) (1) and 8(a) (3) of the Act should not be enforced.

1. Unit Drop Forge Division, Eaton, Yale & Towne, Inc. v. N.L.R.B., No. 16942.