**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SELIGMAN AND ASSOCIATES, INC., and its Wholly Owned Division, Scott Management Company, Respondent.**

No. 85–5404.

United States Court of Appeals, Sixth Circuit.

Argued April 28, 1986.

Decided Dec. 30, 1986.

---

Elliott Moore, Deputy Associate General Counsel, N.L.R.B., Washington, D.C., William R. Stewart, Stephen Smith (argued), Bernard Gottfried, Director, Region 7, NLRB, Patrick V. McNamara, Detroit, Mich., for petitioner.

Richard Bisio (argued), Hyman, Gurwin, Nachman, Friedman & Winkelman, Southfield, Mich., for respondent.

Before ENGEL, KENNEDY and MILBURN, Circuit Judges.

ENGEL, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order requiring Seligman & Associates, Inc., to pay backpay to two former employees, to pay the medical expenses of a third former employee, and to post notices describing the remedial action ordered. *Seligman & Assoc., Inc.*, 273 N.L.R.B. 1216 (1984). We enforce the order as to the payment of medical expenses and the posting of notices; we remand the determination of backpay for recomputation based on our conclusion that the two former employees willfully failed to seek comparable employment to mitigate their losses.

A division of Seligman, Scott Management Co., operates a number of apartment complexes in the Detroit, Michigan area. On January 24, 1979, the Board found that Seligman had committed unfair labor practices by, among other things, discharging David and Susan Younce in retaliation for protected activity, in violation of section

8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), and discharging Clarence Goold because of his union activity, in violation of section 8(a)(1) and (3), 29 U.S.C. § 158(a)(1), (3) (1982). *Seligman & Assoc., Inc.,* 240 N.L.R.B. 110 (1979). The Board ordered Seligman to offer its unlawfully discharged employees reinstatement to their former positions, to make them whole, and to post notices. *Id.* This court granted judgment enforcing that order. *Seligman Assoc., Inc. v. NLRB,* 639 F.2d 307 (6th Cir.), *cert. denied,* 454 U.S. 838, 102 S.Ct. 144, 70 L.Ed.2d 120 (1981). The present enforcement petition arises out of a supplemental decision and order by the Board specifying the amount of backpay due David and Susan Younce, the amount of medical compensation due Clarence Goold, and the contents of the required notice.

David and Susan Younce had been employed by Seligman as apartment complex caretakers at Seligman's Eureka Apartments. They received salaries as well as housing at the complex as compensation. Following their termination they continued to occupy their townhouse apartment until they received a notice to quit the apartment on October 26, 1976. Two days later, Susan Younce filed an unfair labor practice charge with the Board. Seligman's attorney, Irwin Alterman, investigated the charge and recommended to Seligman that they settle the claim by offering the Younces caretaker positions at another apartment complex some 30 to 50 miles distant, with backpay.[1] Seligman agreed and its attorney contacted Board agent Whiteman to convey the settlement proposal.[2] Whiteman contacted Susan Younce and, according to her testimony as credited by the ALJ, asked her, "If Mr. Seligman offered you your job back with backpay, would you take it?" Younce replied, "No, I don't want to work there anymore. I don't even want to be around here anymore." Whiteman responded, "You know you could get

your backpay without taking your job back," and Younce replied, "Fine." Following this conversation, Whiteman informed Seligman's attorney that the Younces did not want their jobs back. The Younces later received a notice from Seligman requesting that they report to the Utica Green apartment complex for work. They did not respond.

On the fifth or sixth of November, while her husband and three children were ill, Susan Younce contacted Scott Seligman directly, told him of her family's illness, and asked if they could remain in the apartment as paying tenants. Seligman replied that they could, provided she drop her unfair labor practice claim. On November 8, Susan Younce called Whiteman to tell him that she wanted to drop the charge. Whiteman advised against doing so, and *informed her that if she nevertheless wanted to relinquish the claim, she would have to do so in writing.* She next called Scott Seligman again, who advised her to obtain a withdrawal request form from the Board and to go to his attorney's office to sign a lease.

On November 11, the Younces received another eviction notice. The next day, Susan Younce met with Seligman's attorney at his office. After discussing her desire and attempts to drop the charges, the attorney informed Younce that she would have to sign an affidavit describing her attempts to withdraw the charges. He then dictated both an affidavit and a withdrawal letter which, after some changes in style, Younce signed.

The ALJ credited Susan Younce's testimony throughout the hearing, including the following account of her meeting with Seligman's attorney:

I was supposed to go there to get a lease and instead, I got these [the affidavit and withdrawal letter].... Now I'm a little bit calm about it, but when this

---

1. Seligman contends that the change of location was compelled by conflicts between the Younces and the resident manager at Eureka.

2. At oral argument, Seligman's attorney stated that they employed the Board agent as an intermediary in order to avoid any inference of coercion against the Younces.

was taking place I was nervous and upset and I don't think I was in the right [frame of] mind to really know what I was doing. I went to [Alterman's] office for a lease and I ended up having to do all this. I felt pressured in [his] office when I wrote it for one thing, and I said, "Yes, it is okay," and I signed it just to get out of there.

In its supplemental decision and order, the Board accepted the ALJ's determination that: (1) Seligman had extended only a hypothetical reinstatement offer to the Younces; (2) the reinstatement offered was not to their former positions, but to similar positions at a different location and for different management; and (3) Seligman must bear the cost of any confusion in the reinstatement offer resulting from its use of a Board agent as an intermediary with the Younces. It further concluded that Susan Younce was intimidated at her meeting with Seligman's attorney and that her statements made then that she did not desire reinstatement were not binding. It accordingly determined that Seligman's backpay obligation to the Younces was not tolled and that the Younces were entitled to backpay in the amount of $27,557.96.

The Board further ordered Seligman to pay directly to the hospital and doctor the medical expenses incurred by Clarence Goold, but never paid by him. Finally, the Board ordered that the notices to be posted by Seligman include references to the remedies afforded the Younces, Goold, and six other former employees.

Seligman argues that the Younces declined valid reinstatement offers, that they suffered a willful loss of earning following their discharge, and that the Board erred in calculating their backpay. Seligman further contends that it owes nothing to the hospital and doctor for Goold's medical treatment because the hospital and doctor are now barred from collecting on those debts. Finally, Seligman maintains that the notices should contain no reference to the remedies afforded the Younces and Goold under the order or to the remedies

afforded six other employees whose claims were settled.

## CLARENCE GOOLD

First, we have little difficulty enforcing the Board's order directing Seligman to reimburse the hospital and doctor for Goold's medical treatment, even though those charges might now be subject to a statute of limitations defense were Goold sued for their collection. In his dissent, Board member Robert B. Hunter noted that as of the date of the Board's opinion, Goold had not been required to pay the bills incurred in 1976 and 1977. He noted that Seligman had excepted only to the payment of the medical expenses directly to Goold, which might result in a windfall to him, since there was no assurance that he would ever be obligated to pay those creditors. The dissenting member would therefore order respondent to indemnify Goold if any collection action on the bills were instituted. In effect, the dissenting Board member would only have required Seligman to hold Goold harmless from liability rather than to pay the bill. The Board ordered payment of those bills directly to the providers of the services.

We are furnished no evidence, other than of the passage of time, that the payment of these bills may be subject to an effective statute of limitations defense. The passage of time does not act to extinguish the debt, of course, but may under an applicable statute of limitations bar legal action to recover it. Since the delay or failure to pay the bill is at least arguably a result of Seligman's unlawful refusal to honor the debt in the first place, respondent is in a poor position to take advantage of its own improper conduct. Even assuming the statute of limitations applied and there was no tolling under state law, the debt can remain upon the books and have an adverse effect upon the employee's ability to obtain future medical services from those providers or from others who may be aware that previous providers had not been paid. Thus, the unpaid debt, even if uncollectible legally, can still have an adverse effect

upon Goold attributable to the respondent's 8(a)(3) and 8(a)(1) violations. The Board's ruling here is consistent with the Supreme Court's holding that the "make whole" remedial power of the Board is "a broad discretionary one, subject to limited judicial review." *Fibreboard v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964). The Board's order with reference to Clarence Goold is therefore enforced in full.

## DAVID AND SUSAN YOUNCE

Seligman raises the same argument here that it presented to both the ALJ and the Board. Seligman first argues that the Younces received and rejected a valid offer of reinstatement which tolls the accrual of backpay. It next contends that even if its offer was invalid, the Younces are estopped from seeking backpay because the offer was invalidated through an error by the Board in transmitting the offer and, since this error was not disclosed to Seligman, Seligman believed it had been a valid offer. It further notes that the Younces unequivocally repudiated any desire for reinstatement and that, based upon its good faith belief that it had made a valid offer, Seligman relied upon this repudiation in not correcting any technical deficiences in the offer actually made. Third, Seligman claims that the Younces suffered a willful loss of earnings by refusing reinstatement to a different position and failing to seek similar available employment. Finally, Seligman maintains that the ALJ made errors in calculating the backpay due the Younces.

In *Morvay v. Maghielse Tool and Die Co.,* 708 F.2d 229 (6th Cir.), *cert. denied,* 464 U.S. 1011, 104 S.Ct. 534, 78 L.Ed.2d 715 (1983), our court discussed the requisites of a reinstatement offer that will terminate backpay accrual:

> The purpose of an offer to reinstate is to "undo the employer's wrong by restoring the employees to the position they would have occupied before the wrong occurred." *Ridgely Mfg. Co. v. NLRB,* 510 F.2d 185, 188 (D.C.Cir.1975). Therefore,

an offer is insufficient to terminate back pay liability; if it is conditional upon an employee's reapplying of his job; if it does not restore seniority or other benefits accrued by the employee; if the job which he is offered is temporary; if it is conditioned upon the employee relinquishing his unfair labor practice claim; if the employee has insufficient time to accept the offer; or if it is conditioned upon the union steward resigning. Respectively, *Shelly & Anderson Furniture Mfg. Co., Inc. v. NLRB,* 497 F.2d 1200 (9th Cir.1974); *Ridgely Mfg. Co., supra; Oil, Chemical and Atomic Workers International Union, AFL–CIO v. NLRB,* 547 F.2d 598 (D.C.Cir. 1976); *NLRB v. Midwest Hanger Co.,* 550 F.2d 1101 (8th Cir.1977); *NLRB v. Murray Products, Inc.,* 584 F.2d 934 (9th Cir.1978); and *Associated Truck Lines, Inc. v. NLRB,* 653 F.2d 241 (6th Cir.1981). However, reasonable conditions accompanying the offer do not invalidate it. *Ridgely Mfg., supra* (condition that employee follow rules and regulations of the company was unreasonable only because it was a pretext to suppress employee's union activities). And, finally, to terminate an employer's back pay liability, the reinstatement offer must be clear and actually communicated to the discharged employee. *Kenston Trucking Co.,* [*v. NLRB,* 544 F.2d 1165, (2d Cir.1976)], *supra.*

*Id.* at 232. In *Morvay,* the court noted that the company had offered reinstatement to the unfairly discharged employee's former position and the employee understood that he would be restored to the position he occupied before his wrongful discharge. In spite of other conditions on reinstatement, our court found the offer sufficient to terminate the accrual of backpay.

 In the present case, Seligman did not extend an offer of reinstatement to the Younces' former position, but rather to a position at another complex some 30 to 50 miles distant, a position that the Board found was not comparable. Seligman argues, though, that the position at Utica Green was the same or substantially equiv-

alent to the Younces' former position and therefore satisfied its obligation to offer reinstatement.

Although it is generally stated that an employer must offer unfairly discharged employees their former positions or substantially similar ones, the First and Tenth Circuits have held that the employer does not really have an option:

> Generally, when employees are unlawfully discharged and the NLRB orders reinstatement to their former or substantially equivalent positions, the employer does not have a choice of offering either the former or an equivalent position. If the former position still exists, he must offer that one.

*NLRB v. Jackson Farmers, Inc.*, 457 F.2d 516, 518 (10th Cir.1972); *see also NLRB v. Draper Corp.*, 159 F.2d 294, 297 (1st Cir. 1947); *Chase Natl. Bank*, 65 N.L.R.B. 827, 829 (1946).

We need not determine whether our circuit will follow the lead of the First and Tenth Circuits, however. The Board here in unequivocal language required Seligman to offer the Younces "reinstatement to their former jobs or, if their former jobs no longer exist, to substantially equivalent jobs." *Seligman & Assoc., Inc.*, 240 N.L.R.B. 110, 123 (1979). There is neither any showing nor any finding that the position at Eureka had been filled by the time Seligman communicated its conditional offer of reinstatement. Under such circumstances, Seligman's offer of reinstatement to a position at another complex did not satisfy the Board's order, the validity of which has already been upheld and cannot be relitigated here. The conditional offer of alternative employment, therefore, could not have tolled Seligman's backpay obligation.

■ Given the Younces' subsequently demonstrated willingness to move and the absence of any particular evidence of ties to the immediate vicinity of the Eureka Apartments, we are not prepared to say whether, had the Eureka Apartment post already been filled, the offer of a position at Utica Green might not have been substantially equivalent, or sufficiently so to

have satisfied Seligman's obligation. It may well have been true also that Seligman and its attorneys in good faith believed that because of the past record of relations between the Younces and the building manager, it was in the best interest of all parties, including the Younces, that they reenter employment with Seligman where potential personality conflicts might not exist. The difficulty is, however, that the option should have been that of the Younces as the injured party and not of Seligman, and that Seligman's offer, coming on the heels of admitted violations of the Act, could very likely be seen by Seligman's other employees as grudging compliance at best and, at worst, as punitive. An employer may not transfer employees for purposes of discouraging membership in a legal organization. *NLRB v. White Motor Company*, 404 F.2d 1100, 1102 (6th Cir. 1968). Reinstatement to another location after termination because of protected activity, absent a dominant legitimate business reason, would achieve the same result as a transfer to discourage union membership.

■ Even if an offer of reinstatement to the same position at another apartment complex would have satisfied Seligman's obligation, the Board contends that the offer actually conveyed to Susan Younce was hypothetical in nature and therefore was not a valid good faith offer of reinstatement. The ALJ and the Board credited Younce's testimony that Agent Whiteman relayed Seligman's offer in the following manner: "If Mr. Seligman offered you your job back with backpay, would you take it?" The Board concluded that this offer was hypothetical in nature and consequently insufficient to toll the accrual of backpay. *Seligman & Assoc., Inc.*, 273 N.L.R.B. 1216, 1217.

As noted above, our court in *Morvay*, 708 F.2d at 232, discussed the reasons for and requisites of valid offers of reinstatement. It did not state there, however, whether an offer as phrased by Agent Whiteman would be valid.

The validity of an offer should, if possible, be determined from the face of the offer and from the perspective of whether the offer reasonably puts strikers on notice that they were being offered reinstatement. *NLRB v. W.C. McQuaide, Inc.*, 552 F.2d 519, 530 (3d Cir.1977). If the language of an offer is ambiguous, the court must look to the surrounding circumstances. *NLRB v. Consolidated Dress Carriers, Inc.*, 693 F.2d 277, 279 (2d Cir.1982); *Kenston Trucking Co. v. NLRB*, 544 F.2d 1165, 1167 (2d Cir.1976). "Essentially ... the validity of an offer depends on the situation in which the offeree finds himself as a result of the discrimination against him." *NLRB v. Murray Prods., Inc.*, 584 F.2d 934, 940 (9th Cir.1978). Moreover, a reviewing court must defer to the Board's expert determinations. *Patternmakers' League of North Am. v. NLRB*, 473 U.S. 95, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985); *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1978); *National Business Forms, Inc. v. International Printing Pressmen & Assistants' Union*, 457 F.2d 737, 741 (6th Cir.1972). This deference applies both to findings of fact and construction of the Act. *Baker Mfg. Co. v. NLRB*, 759 F.2d 1219 (5th Cir. 1985).

The fact that the offer is phrased as a question does not necessarily render it invalid. *Kenston Trucking*, 544 F.2d at 1167. However, the offer must still indicate the availability of the former or a comparable position. Seligman's offer did not convey that there was a job available, unlike the offer in *W.C. McQuaide*, 552 F.2d at 529, where the employer stated, "If you want your previous job, which is available, contact me as soon as possible." *Id.* at 529. Whiteman's comments in relaying Seligman's offer did not "establish[ ] unequivocally that ... there [was] a position [and] that the job [was] immediately available." Whiteman's comments were more like those made in *National Business Forms*, 457 F.2d at 739, where the employer sent out letters stating, "If you wish to be considered as an applicant for reinstatement, please complete the enclosed form

and return it to us." The Sixth Circuit there enforced the Board's order, which determined that the letters did not constitute valid offers sufficient to toll backpay liability. *See also Corrugated Partitions West, Inc.*, 275 N.L.R.B. No. 126 (June 28, 1985) (The question, "Are you willing to come back to work for us if we need you?" did not constitute an unequivocal offer of reinstatement.). See also *Wen Hwa Ltd.*, 208 N.L.R.B. 828, 837 n. 25 (1974), stating that a question put to an employee as to whether he would return to work if offered reinstatement does not present a specific, unequivocal offer of reinstatement.

Seligman argues that the offer it conveyed to Board agent Whiteman was not hypothetical, and that it cannot be made to suffer the detrimental effects of Whiteman's error when he conveyed the offer to the Younces. However, when faced with the choice of placing the burden of Board errors on either a wrongfully discharged employee or her former employer, the Supreme Court has chosen to burden the employer. It has held that the Board does not err when it places the full cost of an unfair labor practice on the employer who committed it, even when the cost of backpay is greatly increased by the Board's own deplorable delay in processing the charge. *NLRB v. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969).

Assuming without deciding that the delay in issuing the specification did violate the Board's duty of prompt action under the Administrative Procedure Act, it does not follow that enforcement of the full back-pay remedy was an abuse of the Board's discretion. Wronged employees are at least as much injured by the Board's delay in collecting their back pay as is the wrongdoing employer. In view of "the economic hardship caused by many years of undeservedly substandard earnings," lengthy delays "must render the back pay award a wholly inadequate and unsatisfactory remedy" to the employees for the company's refusal to reinstate them. *NLRB v. Mastro Plastics Corp.*, 354 F.2d 170, 180

(C.A. 2d Cir.1965). This Court has held before that the Board is not required to place the consequences of its own delay, even if inordinate, upon wronged employees to the benefit of wrongdoing employers.

*Id.* at 264–65, 90 S.Ct. at 420–21.

Even if Whiteman violated some duty by conveying Seligman's offer as hypothetical, that mistake, like the wrongful delay in *Rutter-Rex*, would have worked to the Younces' detriment as much as to Seligman's. The Board did not exceed its authority or abuse its powers in charging the consequences of any mistake to Seligman rather than to the Younces. This result comports with the rule that an offer of reinstatement, to terminate backpay liability, must be actually communicated to the discharged employee, *Morvay*, 708 F.2d at 232, and simply places the burden of ensuring actual communication of the offer upon the wrongdoer. Under normal rules of agency, the errors of Whiteman in this regard would be attributable to Seligman, which selected Whiteman as its agent for the limited purpose of communicating its offer.

■ The most difficult issue raised by Seligman is whether Susan Younce's refusal of the offer as conveyed by Board agent Whiteman or her subsequent repudiation of any desire to seek reinstatement tolled Seligman's backpay obligation by obviating the need for Seligman to make a valid reinstatement offer. The Board held that "only when a proper offer is made and unequivocally rejected by the employees is the employer's backpay obligation tolled." *Seligman & Assoc., Inc.*, 273 N.L.R.B. 1216, 1217 (1984).

Two circuits have applied this rule. *Heinrich Motors, Inc.*, 403 F.2d 145 (2d Cir.1968); *EEOC v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir.1980). In *Heinrich*, the court quoted the Board's reasoning that the discharged employee's statement to the Board compliance officer that he did not desire reinstatement with the Company did not operate as a waiver because such statements,

"may reflect only a momentary state of mind that is subject to change; prior to an offer of reinstatement, such statements are in the nature of answers to a hypothetical question; and the discriminatee's expression may have been made in the heat of dissatisfaction with his treatment by [the employer]."

403 F.2d at 150; *Sandia*, 639 F.2d at 627–28 (quoting the same language).[3]

In *Consolidated Freightways v. NLRB*, 669 F.2d 790 (D.C.Cir.1981), however, the D.C. Circuit in an opinion of Judge Wald remanded to the Board a case in which the Board failed to consider the employee's reasons for rejecting a possibly invalid offer of reinstatement. The court stated that a line of Board precedent makes it necessary to inquire into an employee's reason for refusing an offer of reinstatement to determine whether the employee would have refused the offer even if it were valid. The court held:

In view of the Board's failure to reconcile its decision in this case with its precedent, and its failure to explain its reasons for abandoning any inquiry into the reasons why a conditional offer is refused, we have no choice but to remand this case to the Board to explicate the circumstances, if any, under which an inquiry into whether an employee would have rejected a valid offer of reinstatement is

---

**3.** A different rule apparently applies to strikers, even those unlawfully discharged after the strike begins. *See Top Mfg. Co.*, 254 N.L.R.B. 976, 977 (1981); *Marlene Ind. Corp.*, 255 N.L.R.B. 1446, 1449 n. 12 (1981), *enforcement denied on other grounds*, 712 F.2d 1011 (6th Cir.1983); *Garrett Railroad Car & Equip., Inc. v. NLRB*, 683 F.2d 731, 741–42 (3d Cir.1982); *NLRB v. Lyon & Ryan Ford, Inc.*, 647 F.2d 745, 756 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70

L.Ed.2d 209 (1981); *NLRB v. Trident Seafoods Corp.*, 642 F.2d 1148, 1149–50 (9th Cir.1981); *NLRB v. Mars Sales & Equip. Co.*, 626 F.2d 567, 575 (7th Cir.1980); *J.H. Rutter-Rex Mfg. Co. v. NLRB*, 473 F.2d 223, 242–43 (5th Cir.), *cert. denied*, 414 U.S. 822 (1973); *but see NLRB v. Laidlaw Corp.*, 507 F.2d 1381, 1382 (7th Cir. 1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975).

proper. *See generally Road Sprinkler Fitters Local No. 669 v. N.L.R.B.*, 600 F.2d 918, 923 (D.C.Cir.1979); *N.L.R.B. v. Madison Courier, Inc.*, 472 F.2d 1307, 1326 (D.C.Cir.1972); *Burinskas v. N.L.R.B.*, 357 F.2d 822, 827 (D.C.Cir.1966). *Id.* at 798 (footnote omitted).

The Board has previously held that for an employee's statement rejecting reinstatement to absolve the employer of its obligation to offer reinstatement, the employee must be put to a true test of deciding whether to accept reinstatement and must reveal an unequivocal rejection of the offer. *Lipman Bros., Inc.*, 164 N.L.R.B. 850, 855 (1967). Moreover, an employee is under no obligation to decide whether to accept reinstatement until an unconditional offer of reinstatement is made. *Leeding Sales Co., Inc.*, 155 N.L.R.B. 755, 757 (1965). Consequently, the Board has stated that a waiver of the right to reinstatement, absent a valid offer of reinstatement, "does not manifest an 'unequivocal resolve not to accept reinstatement.'" *Top Mfg. Co.*, 254 N.L.R.B. 976, 977 (1981) (quoting *Lyman Steel Co.*, 246 N.L.R.B. 712, 714 (1979)). The Board has also uniformly held that an offer of reinstatement must be specific, unequivocal, and unconditional in order to toll the backpay period. *See, e.g., Jones Plumbing, Inc.*, 277 N.L.R.B. No. 47 (November 13, 1985) (citing *L.A. Water Treatment*, 263 N.L.R.B. 244, 246 (1982)). The Board's decisions, although not always models of clarity, are similarly consistent with its statement in *Lyman Steel Co.*, 246 N.L.R.B. 712, 714 (1979), that "it does not effectuate the policies of the Act to terminate the employee's backpay rights prior to the time a genuine offer is made, since a statement of waiver absent such an offer does not manifest an 'unequivocal resolve not to accept reinstatement.'"

In *Hribar Trucking Inc.*, 166 N.L.R.B. 745, 756 n. 19 (1967), *enforced*, 406 F.2d 854 (7th Cir.1969), *Eastern Die Co.*, 142 N.L.R.B. 601, 604 (1963), *enforced*, 340 F.2d 607 (1st Cir.1965), and *Research Designing Service, Inc.*, 141 N.L.R.B. 211, 216–17 (1963), the Board did not state that

the refusal of an invalid offer would toll backpay or waive reinstatement, but rather held that the rejection of offers that appeared valid, at least to the offeree, could nonetheless reveal an unequivocal resolve not to accept reinstatement. Under such circumstances, where the employee was not aware of any improper conditions attached to the offer, it cannot be said that she was not put to a true test, and consequently, that her rejection was not unequivocal on that basis alone. In *Research Designing* the Board also observed that the employees involved had rejected their offers for other reasons, but this observation was apparently intended to show that the employees were unaware of the improper conditions attached to the offer; it was not an inquiry into their reasons for rejecting an invalid offer. Only in *L. Ronney & Sons Furniture Mfg. Co.*, 97 N.L.R.B. 891, 892 (1951), *enforced*, 206 F.2d 730 (9th Cir.1953), did the Board hold that an employee's failure to respond to a conditional offer, coupled with a comment that she preferred her new job, constituted a waiver of reinstatement and backpay. The Board there held that since the employee did not object to the unlawful condition attached to the offer, "It thus appears she would not have accepted the Respondent's offer, even had it been unconditional." *L. Ronney* was not followed by the Board in *Atlantic Maintenance Co.*, although the dissent in *Atlantic* argued that it controlled. *Atlantic Maintenance Co.*, 134 N.L.R.B. 1328, 1329 n. 1 (1961), *enforced*, 305 F.2d 604 (3d Cir.1962).

In a strong dissent from the majority decision of the Board here, member Hunter concluded that the award of backpay for the Younces should have been tolled as of November 11, 1976 when, he concluded, they voluntarily rejected employment with the respondent:

In view of the Younces' clear and unequivocal rejection of employment, in my opinion, it is not necessary to determine whether the Board agent, on behalf of the Respondent, communicated a proper reinstatement offer, an inquiry pursued by the judge. Rather, I believe, it is sufficient that the record clearly shows

that Susan Younce had been apprised of what reinstatement meant before she gave the rejection to the Respondent. Contrary to my colleagues in the majority, I would not require an employer in this situation to simply extend a futile offer of reinstatement literally only 'for the record.'

*Seligman & Assoc., Inc.,* 273 N.L.R.B. at 1218.

There is certainly substantial evidence to indicate that Susan Younce was knowledgeable about her rights and that she did not want her job back. We need not decide what might have been our position on review had the dissent of Board member Hunter been the view of the majority. Likewise, we need not speculate as to what might have been our decision had we been the finders of fact. The Board majority found that "based on [Susan] Younce's credible testimony, ... the circumstances of the 11 November meeting between Younce and Alterman were such that she did not voluntarily renounce reinstatement." The Board credited her testimony that she had gone to see respondent's attorney, Alterman, under the threat of immediate eviction from the parties' apartment, which was a direct consequence of the company's discrimination against her. She also stated that she felt intimidated by Alterman's demand at the meeting that she sign a letter and affidavit withdrawing the unfair labor charge if she wished to obtain a lease. The Board majority further credited Mrs. Younce's testimony that she felt so pressured and nervous that she did not know what she was doing, and that she just wanted to "get out of there." *Id.* at 1217.

Since the offer of reinstatement was conditional and was not for the Younces' former position, and further since there is no proof whatever that the same job was not available, we conclude that substantial evidence supports the Board's findings that Susan Younce's conduct at that period did not amount to a waiver of the parties' right to reinstatement.

We do not find this holding to be inconsistent with the D.C. Circuit's ruling in *Consolidated Freightways v. NLRB,* 669 F.2d 790, for the Board thoroughly discussed the circumstances surrounding the Younces' refusal of the conditional offer and the reasons why it determined that the Younces' refusal was equivocal. It has thus performed the task that in *Consolidated Freightways* it had been directed to undertake. The reasoning of the dissent may have more appeal for some, but this affords no basis for us to intrude upon the Board's authority and expertise.

Finally, the respondent contends that the Younces failed to make reasonable efforts to find new and substantially equivalent employment. Seligman argues that the Younces' refusal of employment at the Utica complex constituted a rejection of equivalent employment and consequently shows their willful loss of earnings. Seligman also argues that the Younces failed to make a diligent search for employment, noting that they did not always buy a newspaper and citing Susan Younce's testimony that they did not specifically focus on apartment complex manager or caretaker jobs in the Detroit area. Seligman also contends that the Younces' relocation to northern Michigan and then to Wisconsin, combined with automobile problems and the need for child care, unnecessarily complicated the search for a job.

The Board adopted the ALJ's findings and conclusions:

> [T]he record indicates through the backpay specification and additional testimony that following their unlawful discharges the Younces obtained employment with approximately 20 different employers between them and unsuccessfully sought employment with many others. The record reflects no willful loss of employment with regard to these jobs. Inasmuch as the law requires only a reasonable effort to find employment, I find that the record reflects that the Younces met that burden during the period following their discharge by Respondent.

ALJ op. at 9 (Joint Appendix at 87).

In *NLRB v. Westin Hotel,* 758 F.2d 1126 (6th Cir.1985), our court summarized the

well-established law governing the defense of willful loss of earnings:

> The Board's exercise of its discretion in formulating backpay awards is subject to a limited amount of scrutiny by the judiciary. . . . In addition, it is beyond peradventure that the defense of willful loss of earnings is an affirmative defense, with the burden of proof resting upon the employer. . . .
>
> Further, a wrongfully-discharged employee is only required to make a reasonable effort to mitigate damages, and is not held to the highest standard of diligence. This burden is not onerous, and does not mandate that the plaintiff be successful in mitigating the damage. . . . The reasonableness of the effort to find substantially equivalent employment should be evaluated in light of the individual's background and experience and the relevant job market. . . .
>
> Finally, it must be remembered that the Board's conclusion as to whether an employer's asserted defenses against liability have been successfully established will be overturned on appeal only if the record, considered in its entirety, does not disclose substantial evidence to support the Board's findings. . . .
>
> The general rule in labor cases is that "an employee must at least make reasonable efforts to find new employment which is substantially equivalent to the position [lost] . . . and is suitable to a person of his background and experience". . . .

*Id.* at 1129–30 (citations omitted).

█ The Board relies heavily upon our decision in *Westin Hotel* as justifying its refusal to accept Seligman's contention that the Younces failed to search diligently for comparable employment. While as we stressed in *Westin* above, the defense of willful loss of earnings is an affirmative defense with the burden of proof resting upon the employer, we conclude that unlike the employer in *Westin,* Seligman here succeeded in establishing by competent unchallenged proof that the Younces had deliberately refused to seek comparable and equivalent employment opportunities and that such work was in fact available at all relevant times. Further, we find in the record no reasonable basis for their failure to pursue those opportunities, which is sufficient to impose the resulting loss upon the defending employer.

It should at the outset be plainly understood that the Younces cannot be charged with failure to mitigate their damages simply because they refused the offer of alternative employment at respondent's Utica Green apartment complex located some 30 to 50 miles from the Eureka Apartments at which they had worked. To hold that they were bound to accept such alternative employment from the former employer when their original position still remained open would effectively negate the legal requirement that the employer comply with the order of reinstatement previously entered. At the same time, in our view, no excuse exists for the employees' refusal to seek other comparable employment in the vicinity when there is undisputed proof that such employment existed. It was error for the Board to have refused to take such evidence into account given its undisputed nature.

While we have held that Susan Younce's testimony concerning her November 11 conversation with Seligman's attorney was not sufficient to constitute a waiver of a reinstatement offer, we nevertheless think it is entirely appropriate to consider the circumstances in their entirety and in connection with the remaining testimony of the parties and other evidence concerning the Younces' subsequent efforts to find other employment generally.

The settled law concerning a discriminatee's duty to mitigate damages by seeking other employment, and the burden placed upon the employer to make an affirmative showing of such failure before its liability for backpay can terminate is chronicled in an exhaustive opinion of the D.C. Circuit, *NLRB v. Madison Courier, Inc.,* 472 F.2d 1307 (D.C.Cir.1972). As the cases cited therein at pages 1317–21 make plain, to be entitled to backpay, an employee must

make "reasonable efforts to find new employment which is substantially equivalent to the position from which he was discharged, and is suitable to a person of his background and experience." *Southern Silk Mills, Inc.*, 116 N.L.R.B. 769, 773 (1956), *enforcement denied*, 242 F.2d 697 (6th Cir.) (discharged employee must make efforts to find other employment even if not substantially equivalent), *cert. denied*, 355 U.S. 821, 78 S.Ct. 28, 2 L.Ed.2d 37 (1957). *See also NLRB v. Miami Coca-Cola Bottling Co.*, 360 F.2d 569 (5th Cir. 1966), cited favorably by our circuit in *NLRB v. Robert Haws Co.*, 403 F.2d 979, 981 (1968), and by the D.C. Circuit in *NLRB v. Madison Courier, Inc.*, 472 F.2d at 1318. Our circuit's holding in *Westin*, 758 F.2d 1126, did not disturb that rule. There we recognized that "a wrongfully-discharged employee is only required to make a reasonable effort to mitigate damages, and is not held to the highest standard of diligence. This burden is not onerous, and does not mandate that the plaintiff be successful in mitigating the damage." The reasonableness of the effort to find substantially equivalent employment should be evaluated in light of the individual's background and experience and the relevant job market. *Id.* at 1130 (citations omitted). As the recited facts in *Westin* demonstrate, the employee there did in fact search for substantially equivalent employment in the Detroit area. She sought employment in a number of positions within a ten-mile radius of her home, and the Board credited her testimony that she did not seek further employment at a hotel cocktail lounge of comparable quality to that of the Westin because of her previous job-seeking experience and because she was apprehensive of being refused employment until she was first cleared of any charge of wrongdoing in connection with her discharge by Westin. No similar circumstances are found in the record here. On the contrary, the employer had, immediately upon conferring with its lawyer, concluded that the Younces had been wrongfully terminated. There was nothing to indicate that the Younces' background and experience did not fully qualify them for employment comparable to their former position with Seligman. The undisputed proof showed that there were ample similar employment opportunities in the Detroit area.

In support of its assertion that the Younces willfully failed to mitigate damages, Seligman presented the testimony of Brian Holland, which was received without objection and without cross-examination. Holland testified that he had gone both to the Macomb County Community Library and the Farmington Hills Library, and there examined microfilms of *The Detroit News*, *The Detroit Free Press*, and other papers in search of the classified ads in those papers since 1976 or 1977, and in consequence he had prepared Respondent's Exhibit No. 6, which was thereafter received into evidence without objection. This evidence included photostatic copies of microfilms of the classified ads of *The Detroit News* and *The Detroit Free Press* starting in November, 1976, and running to March, 1983. The witness testified that he had sought to obtain at least one ad for each month demonstrating employment opportunities available to caretaker couples. He testified that there were "10 to 20, 5, 3" in some editions. He further testified that the classified ads offered the same or similar employment to the claimants' former position at Eureka. While the particular exhibit has not been included among the materials before us, it is plain from the record that those exhibits were carefully examined, and after simply verifying the source of the records, the Board's attorney, Mr. Ciaramitaro, agreed to their admission. Seligman's attorney then asked the witness, "Do I understand that without reading them all into evidence, it would be a fair statement to say that in each of these editions there are ads seeking to employ caretaker couples?" The witness answered in the affirmative, and the identified exhibit was then received by the judge into evidence. In addition to the extensive evidence relied upon by dissenting Board member Hunter in which the Younces appeared to have notified the Board agent

that they did not want to work for Seligman anymore, the employees testified extensively to their activities thereafter in seeking employment. The following testimony of Susan Younce, taken from the record, is undisputed:

Q: Did you look in the newspaper for an ad?

A: Sure, we've looked in the paper all the time for jobs.

Q: Did you look for any apartment complex manager jobs?

A: No. I didn't want to get involved in that.

Q: So would it be fair to say that you never tried to get a job, you and your husband, as an apartment couple after you left Eureka?

A: For a while I would say.

Q: You just testified you didn't want to get in.

A: I didn't want to get involved in that again.

Q: So you didn't look for that type of job again, did you?

A: Not in Michigan. In Wisconsin I did.

Q: Would it be fair to say that while you were in Michigan after you left Eureka until the time you got to Wisconsin, you never looked for a job as a caretaker couple like you had at Eureka?

A: Right.

\* \* \* \* \* \*

According to the Younces' testimony then, they never looked for a job as a caretaker couple from the time of their discharge until the time they got to Wisconsin, approximately four years after their unlawful termination on October 7, 1976. This testimony was reiterated in Susan Younce's later testimony:

Q: Now, let me ask you a question: Do I understand it clearly that you and your husband did not look for a caretaker couple job from the time you left Eureka until the time you went to Wisconsin? Is that a fair statement?

A: It is fair to the best of my knowledge.

Q: Well, you didn't look for one, did you?

A: Not that I can remember, no.

\* \* \* \* \* \*

And yet later:

Q: ... One thing is certain, you and your husband since you left Eureka never made an application as a caretaker couple at another apartment complex?

A: Not to my knowledge.

Q: To your knowledge, did you examine some of the ads in the newspaper after you left Eureka?

A: Did I look in the ads for jobs?

Q: Yes.

A: Yes, we've done that quite a bit.

Q: Did you ever see ads for caretaker couples that were in the newspaper at the time from the time you left Eureka?

A: I don't remember. I really don't.

Q: If they were there, you would have ignored them anyway? You didn't want to work in a complex?

A: How can you say that?

Q: You tell me.

A: I'm not saying I would have refused a job. I'm just saying I was not looking for a job as a caretaker couple.

Q: You did not look for a job as a caretaker?

A: No, I wasn't out searching for a job as a caretaker.

Q: So as a matter of fact, if there were ads in the paper, you wouldn't even have looked at those ads, would you?

A: Sure. I look at all kinds of ads.

Q: I mean for a caretaker couple.

A: Specifically just go through all the papers and see if there's any caretaker jobs, no. I didn't do that.

Q: You didn't look for a caretaker couple because you weren't interested in taking that kind of work any more. Isn't that true?

A: Sure.

In *Westin* it was apparent that the discharged employee did in fact seek comparable employment, and the only question was whether her failure to seek it in particular

places would show a willful failure. We held to the contrary and recognized, as we do even now, the broad range of discretion accorded the Board in determining this issue. It is true that the Younces testified as to numerous jobs which they did take from time to time as they traveled throughout Michigan and Wisconsin, and it is also true that the administrative law judge credited earnings accumulated in that period against backpay otherwise due. We do not believe, however, that on the proofs before us, David and Susan Younce's refusal to seek comparable and substantially equivalent employment when it was so clearly available can be characterized as anything other than willful. It is plain that they were seeking a substantial change in lifestyle, one which was inconsistent with continuing the type of employment from which they had been discharged. A Board policy that would compel an employer, however wrongful the employer's original conduct, to underwrite such activity indefinitely under these circumstances does not promote the purposes of the act, nor does it comport with the uniform definition of the duty to mitigate that has been employed consistently by both the Board and the several circuits which have considered the problem.

In short, we conclude that the existing award of backpay must be denied enforcement and the cause remanded to the Board for recomputation by taking into account our determination that the Younces willfully failed to seek other comparable employment in mitigation of their losses. While it would be possible for us to endeavor to determine what would have been a reasonable time for the Younces to wait after rejecting the offer of alternative employment made by Seligman, see, e.g., dissent of Judge Wellford in Westin, 758 F.2d at 1132, we are of the opinion that judgment should be in the first instance exercised by the Board but in conformity with our determinations here.

### THE NOTICES

██ With respect to the posting of notices, Seligman indicated that the Regional Director had agreed to amend the notice and order to reflect that the respondent had offered reinstatement to all discriminatees except Susan and David Younce. The Board does not refute this claim, but in its brief urges approval of the language finally settled upon by the Board, which includes the names of Seligman's other employees whose discrimination charges had been settled and who had refused unconditional offers of reinstatement. Counsel for the Board observed: "The Company has given no reason, however, why it should not inform its employees of its violations of the Act, as found by the Board and this Court, or of the remedies given for those violations. Rather, such notice would serve the statutory purpose of assuring all of the Company's employees 'of an unhampered right in the future to determine their own labor affiliations' (*NLRB v. Falk Corp.*, 308 U.S. 453, 462–463, [60 S.Ct. 307, 312, 84 L.Ed.2d 396] (1940)), and accordingly the notice posting requirement is well within the Board's broad remedial discretion." Brief for the NLRB at 41 n. 20.

We agree with the Board that it has wide discretion in determining the language and scope of appropriate notices to be posted. We therefore enforce the posting requirements of the Board's order, but with the understanding that the Board retains its discretion to amend the notice in the manner agreed upon by the Regional Director.

Enforcement is granted in part, denied in part, and the cause remanded to the Board for further proceedings consistent with this opinion.